# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LOCALS 302 AND 612 OF THE INTERNATIONAL UNION OF OPERATING ENGINEERS – EMPLOYERS CONSTRUCTION INDUSTRY RETIREMENT TRUST, *on Behalf of Itself and All Others Similarly Situated,*<br><br>Plaintiff,<br><br>*v.*<br><br>MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.; DAVID MARTIN; PER DYRVIK; HUGH CORCORAN; UBS REAL ESTATE SECURITIES, INC.; UBS SECURITIES, LLC; MOODY'S INVESTOR SERVICES, INC. and THE MCGRAW-HILL COMPANIES, INC.,<br><br>Defendants. | Docket No.:<br><br><br>**COMPLAINT FOR VIOLATION OF SECTIONS 11, 12 AND 15 OF THE SECURITIES ACT OF 1933**<br><br><br>**ECF CASE** |

Plaintiff, Locals 302 and 612 of the International Union of Operating Engineers – Construction Industry Retirement Trust ("Operating Engineers" or "Plaintiff"), alleges the following based upon the investigation of counsel, Cohen Milstein Sellers & Toll PLLC, which included a review of United States Securities and Exchange Commission ("SEC") filings by Mortgage Asset Securitization Transactions, Inc. ("MASTR"), UBS Securities, LLC ("UBSSEC"), UBS Financial Services, Inc. ("UBSFS") and the MASTR Adjustable Rate Mortgages Trust 2007-3 (the "MASTR Trust" or the "Issuing Trust"), as well as regulatory filings and reports and advisories about MASTR, UBSSEC, UBSFS and the Issuing Trust, press releases and other public statements issued by Nationally Recognized Statistical Ratings Organizations ("NRSRO") about MASTR, UBSSEC, UBSFS and the Issuing Trust and its own internal investigation. Plaintiff believes that substantial additional evidentiary support will exist

for the allegations set forth herein after reasonable opportunity for discovery.  The claims asserted herein do not sound in or arise from allegations of fraud.

## NATURE OF THE ACTION

1.      This is a class action brought by Plaintiff alleging violations of Sections 11, 12 and 15 of the Securities Act of 1933, 15 U.S.C. § 77a et seq. ("Securities Act"), on behalf of purchasers of MASTR Pass-Through Certificates, Series 2007-3 (the "Certificates" or the "MASTR Certificates") who purchased the Certificates, backed by pools of first mortgages or deeds of trust on residential one- to four-family properties, pursuant and traceable to the public offering of the MASTR Certificates on May 14, 2007.

2.      The Certificates were issued pursuant to a Form S-3 Registration Statement filed with the Securities Exchange Commission on or about December 16, 2005 (SEC File No. 333-130373), thereafter amended by the filing of a supplemental pre-effective Registration Statement on Form S-3/A dated April 4, 2006 (the "Registration Statement"), and a later filed Prospectus Supplement filed with the SEC on Form 424B5 dated May 14, 2007 (collectively the "Offering Documents").  The Offering occurred in this venue.  The Certificates herein are mortgage-backed securities ("MBS") collateralized by mortgages principally originated by Countrywide Home Loans, Inc. ("CHL") and IndyMac Bank, F.S.B. ("IndyMac") (collectively, the "Originators"), which, at all relevant times, were commercial and residential lenders.  The mortgages and liens on the mortgaged properties, constituting the Certificates' underlying collateral were, as set forth in the Offering Documents, to be the principal source by which Certificate purchasers were to obtain repayment of their investment plus interest.  As also set forth in the Offering Documents, the Certificate collateral was purportedly originated by the Originators pursuant to specific underwriting procedures and guidelines (the "Guidelines").  The Underwriter of the Offering was Defendant UBS Securities, LLC ("UBSSEC" or the

2

"Underwriter").  The Underwriter was obligated to conduct meaningful due diligence to ensure that the Registration Statement and Prospectus Supplement contained no material misstatements or omissions, including the stated manner in which the mortgages had been originated.  The Underwriter received massive fees for its work in connection with the Offering.  Based on, *inter alia*, the Underwriters' due diligence and the representations in the Registration Statement and Prospectus relating to the underwriting of the Certificate collateral, NRSROs such as Defendants Moody's Investors Services, Inc. ("Moody's") and Standard & Poor's ("S&P")[1] (collectively, the "Underwriter Ratings Agencies" or "Ratings Agencies," and are included with UBSSEC in the term "Underwriter Defendants") assigned the Certificates among the highest ratings applicable to such debt issues. At the time of the Offering, the Certificates were issued at approximately par, or $1.00 per Certificate unit.

3.       Following the issuance of the Certificates, disclosures began to emerge revealing the Originators routinely disregarded the underwriting guidelines in its mortgage loan origination.  These disclosures were confirmed by substantially higher rates of delinquencies and foreclosures on collateral for such highly-rated debt issues.  These disclosures, and the poor performance of the collateral, caused the Rating Agencies to review and revise the ratings assigned to the Certificates due to the fact that the true nature of the collateral had not been properly assessed at the time of the Offering.  The Rating Agencies dramatically downgraded the Certificates dramatically beginning in early 2009, resulting from the revelations regarding the true underwriting practices used to originate the collateral and the true value and quality of the Certificate collateral, which subsequently caused the substantial decline in the value of the Certificates.

---

[1]       S&P is a division of Defendant McGraw-Hill Companies, Inc. ("McGraw-Hill").

## JURISDICTION AND VENUE

4.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.

5.      This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

6.      Venue is proper in this Court pursuant to Section 22 of the Securities Act. Many of the acts and transactions alleged herein, including the preparation and dissemination of many of the material misstatements and omissions contained in the Registration Statement and Prospectus filed in connection with the Offering, occurred in substantial part in this State. Additionally, the Certificates were actively marketed and sold in this State and several of the UBS entities named as Defendants herein maintain their business headquarters in this State.

## PARTIES

7.      Plaintiff Operating Engineers is a Taft-Hartley Pension fund.  The Operating Engineers purchased the MASTR Certificates described herein pursuant and traceable to the Offering Documents.  Plaintiff and the Class purchased pursuant and traceable to the Registration Statement and later-filed Prospectus Supplement which contained material misstatements and omissions of facts necessary to make the facts stated therein not misleading. Plaintiff and the Class relied on the misstatements and omissions in the Prospectus and have suffered damages pursuant to Sections 11, 12 and 15 of the Securities Act.

8.      UBS Americas, Inc. ("UBSA"), incorporated in Puerto Rico, is a wholly-owned direct subsidiary of UBS AG.  UBSA is a holding company for several of UBS AG's United States indirect operating subsidiaries.  UBS AG maintains the headquarters of its U.S. operations principally at 800 Harbor Boulevard, Weehawken, New Jersey 07086, in addition to its locations

at 677 Washington Boulevard, Stamford, Connecticut 06901 and 1285 Avenue of the Americas, New York, New York 10019.  UBSA, at all relevant times, maintained it principal offices at UBS' Stamford, Connecticut location.

9.      Defendant UBS Real Estate Securities, Inc. ("UBSRES") acted as the Sponsor for the Certificates issued pursuant to the Registration Statement.   UBSRES is a Delaware Corporation that is engaged in a variety of capital markets related activities, including purchases and sales of loan portfolios, sales of assets for inclusion in securitizations and origination and acquisition of loans.   UBSRES, at all relevant times, maintained its principal office at 1285 Avenue of the Americas, 11th Floor, New York, New York 10019.  In addition, UBSRES has substantial presence and business operations at 800 Harbor Blvd, Weehawken, New Jersey 07086.  UBSRES is an affiliate of MAST, a wholly-owned subsidiary of UBSA and a wholly-owned indirect subsidiary of UBS AG.  UBSRES made certain representations and warranties in connection with the loan pools collateralizing the Certificates.  As set forth in the Registration Statement and Prospectus Supplement, UBSRES then conveyed the mortgages to the Depositor, Defendant MASTR, which was formed for the sole purpose of creating, and thereafter depositing the collateral into, the Issuing Trust.  The Issuing Trust then issued the Certificates supported by the cash flows from the assets and were secured by those assets.

10.     Defendant MASTR, at all relevant times, maintained its principal offices at 1285 Avenue of the Americas, New York, New York 10019.  Defendant MASTR was responsible for issuing the Registration Statement pursuant to which the Offering took place.  Defendant MASTR is the parent company of the Issuing Trust, and as such, was responsible for the filing and dissemination of the Prospectus Supplement in connection with the Offering complained of herein.  MASTR is a wholly-owned subsidiary of UBSA.  Defendant MASTR is a special

purpose entity ("SPE"), formed for the sole purpose of filing the Registration Statement with the SEC and thereafter forming the Issuing Trusts and depositing the underlying collateral into the Issuing Trust.   The role of MASTR as the Depositor was to purchase the mortgage loans from the seller and then assign the mortgage loans and all of its rights and interest under the mortgage loan purchase agreement to the trustee for the benefit of the Certificate-holders.   MASTR, as Depositor, was also responsible for preparing and filing any reports required under the Securities Exchange Act of 1934 (the "Exchange Act").

11.      Defendant David Martin ("Martin") was, at all relevant times, MASTR's President and Chief Executive Officer (Principal Executive Officer).   Martin also served as the Head of Interest-Rate Trading and Global Head of Mortgage and Asset-Backed Securities at UBS.   Martin signed the Registration Statement complained of herein.

12.      Defendant Per Dyrvik ("Dyrvik") was, at all relevant times, MASTR's Managing Director and Chief Financial Officer (Principal Accounting Officer).   Dyrvik signed the Registration Statement complained of herein.

13.      Defendant Hugh Corcoran ("Corcoran") was, at all relevant times, MASTR's Managing Director. Corcoran signed the Registration Statement complained of herein.

14.      The Defendants identified in ¶¶11-13, above, are referred to herein as the "Individual Defendants."   The Individual Defendants functioned as directors to the Issuing Trusts as they were officers and/or directors of MASTR and signed the Registration Statement for the securities which were thereafter issued by the Issuing Trust.

15.      The Individual Defendants participated with and/or conspired with the remaining Defendants in the wrongful acts and course of conduct or otherwise caused the damages and

injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

16.     Defendant UBSSEC is an investment bank which, at all relevant times, was principally based in 677 Washington Boulevard, Stamford, Connecticut 06901.  UBSEC also maintained substantial presence and conducted operations out of the Weehawken and New York offices of UBS.  Defendant UBSSEC served as the Underwriter MASTR Offering.  Defendant UBSSEC was intimately involved in the aforementioned Offering and failed to perform the requisite level of due diligence in connection with the Offering.  The Offering Documents disseminated in connection with the Offering contained material misstatements and omissions of material fact relating to the Guidelines employed in originating the underlying subprime mortgage loans.   UBSSEC, at all relevant times, was one of the leading underwriters in mortgage- and asset-backed securities in the United States.  According to industry research for 2005, UBSSEC was the number five U.S.-collateralized mortgage backed securities loan underwriter and master servicer.   UBSSEC, as an essential part of its investment banking business, maintains its principal offices in Stamford, Connecticut, and a substantial presence in New Jersey.

17.     Defendant Moody's Investors Services ("Moody's") is an NRSRO with its principal offices located at 7 World Trade Center at 250 Greenwich Street, New York, New York 10007.   Moody's performs financial research and analysis for commercial and governmental entities and holds a 40 percent share of the world's credit ratings market.  As a condition to the issuance of the Certificates, Moody's purportedly analyzed the Offering to address the likelihood of the receipt of all distributions on the Certificates and assigned

appropriate credit ratings for each tranche of the Offering, which was integral in establishing pricing, interest rates and a market for the Certificates.

18.     Defendant The McGraw-Hill Companies, Inc. maintains a business division d/b/a "Standard & Poors' Ratings Services" ("S&P" shall refer to The McGraw-Hill Companies and its business division Standard & Poors' Ratings Services).  Defendant S&P is an NRSRO with its headquarters located at 55 Water Street, New York, New York 10041.  S&P's performs financial research and analysis for commercial and governmental entities and holds a 40 percent share of the world's credit ratings market.  As a condition to the issuance of the Certificates, S&P purportedly analyzed the Offering to address the likelihood of the receipt of all distributions on the Certificates and assigned appropriate credit ratings for each tranche of the Offering, which was integral in establishing pricing, interest rates and a market for the Certificates.

19.     The Defendants are all liable, jointly and severally, as participants in the issuance of the MASTR Certificates, including issuing, causing, or making materially misleading statements in the Prospectus and Prospectus Supplement and omitting material facts necessary to make the statements contained therein not misleading.

20.     For the purposes of this Complaint, Defendants UBSRES, MASTR, UBSSEC and the Individual Defendants are referred to at times collectively as "UBS" or the "UBS Defendants."

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure behalf of a class consisting of all persons or entities who acquired the Certificates issued by the Issuing Trust, as set forth above, pursuant and traceable to the false and misleading Registration Statement and who were damaged thereby (the "Class").

22.     Excluded from the Class are Defendants, the officers and directors of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

23.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by UBSA, UBSRES, MASTR, UBSSEC or their transfer agents and maybe notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Billions of dollars worth of Certificates were issued pursuant to the Registration Statement.

24.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

25.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

26.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether Defendants violated the Securities Act; whether the Registration Statement issued by Defendants to the investing public negligently omitted and/or misrepresented material facts about the underlying mortgage loans comprising the

pools; and to what extent the members of the Class have sustained damages and the proper measure of damages.

27.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

28.     Currently, the United States is ensnared in a financial crisis arising, in material part, from the greed which drove financial firms to issue billions of dollars of debt securities "collateralized" or securitized with mortgages which only recently have been revealed to have been recklessly underwritten and originated.  The Plaintiff and Class as purchasers of the Certificates have been the victims of just such negligent practices, having purchased the Certificates pursuant to Registration Statement which contained misstatements and omissions concerning the mortgage collateral "securitizing" the Certificates. The Issuing Trust and other entities related to the Offering, *i.e.*, the Depositor and Underwriter Defendant, had enormous financial incentive to consummate the Certificate Offering as quickly as possible since they were paid upon completion a percentage of the total dollar amount of the Offering sold to investors. Since the risk of the underlying collateral failing was not assumed by either MASTR, the Trust, the Trustee or the Underwriter, there was also enormous incentive not to conduct full, complete and meaningful due diligence of the statements in the Registration Statement including those relating to the underlying mortgage collateral.

29.     MASTR filed a Registration Statement Form S-3 with the SEC on December 16, 2005, followed by a pre-effective amendment on Form S-3A filed with the SEC on April 4, 2006, in connection with the issuance of various shelf offerings of MBS which would be

governed by said Registration Statement.  At some time at or subsequent to the Offering at issue, the "Issuing Entity" Trust was then formed, *i.e.,* MASTR Adjustable Rate Mortgages Trust 2007-3, for which a Prospectus Supplement was filed on behalf of as entity responsible for issuing the Certificates at issue herein.

30.     Typically, loans in this type of securitization transaction are originated or purchased from third-party lenders by the Sponsor (*i.e.,* UBSRES) or a subsidiary thereof.  The Sponsor then disposes of its loans primarily by selling them to third-parties and through securitizations.  The Sponsor works with Investment Banks and NRSROs to select the pool of mortgage loans and structure the securitization transaction.  The Sponsor or subsidiary thereof also services the mortgage loans.  On the closing date of the Offering, the Sponsor conveys the initial mortgage loans and the related mortgage insurance policies to the Depositor (*i.e.,* MASTR), who will in turn convey the initial mortgage loans and the related mortgage insurance policies to the Trust, by way of the Trustee.  The Certificates are backed by the Issuer, and consist of, *inter alia*, the mortgage loans; principal and interest on the mortgage loans; and the amounts on deposit in the collection account, including the payment account in which amounts are deposited prior to payment to the certificate holders.  On the payment date, the certificate holders receive payments from the Trustee for the Certificates based on the particular tranche purchased; typically, available funds for each distribution date will equal the amount received by the Trustee and available in the payment account on that distribution date, including interest which differs depending upon the tranche held.

31.     In connection with the Offering, UBSRES, MASTR, UBSSEC and the Ratings Agencies prepared and disseminated the Offering Documents that contained material

misstatements of fact and omitted facts necessary to make the facts stated therein not misleading that were reasonably relied upon by Plaintiff and the Class to their detriment.

**Disclosures Relating To The Originators' Deficient Lending Practices**

> **1.      Disclosures Relating To CHL's Deficient Lending Practices**

32.      Following the issuance of the Certificates collateralized by mortgages originated by Countrywide, delinquency and foreclosure rates on the underlying loans skyrocketed.  The large increases in delinquency and foreclosure rates resulted in substantial downgrades of the Certificates by Moody's and S&P in 2009.  In making these substantial downgrades, the Ratings Agencies cited, in part, "aggressive underwriting practices."

33.      Following the issuance of the Certificates, Countrywide was subject to a number of fraud investigations relating to the company's underwriting practices.  Countrywide is currently under investigation by a panel of the United States Senate for predatory lending – a practice whereby a lender deceptively convinces a borrower to agree to unfair and abusive loan terms, including interest and fees that are unreasonably high.  Countrywide's increased risk of not being able to collect on these predatory mortgage loans puts the Certificates underlying mortgage collateral at risk, thereby further increasing the risk to Plaintiff and the Class.

34.      During an August 29, 2007 press conference reported in *The Wall Street Journal*, Senator Charles Schumer, chairman of the Senate panel investigating Countrywide's predatory lending practices, stated:

> Countrywide's most lucrative brokers are those that make bad loans that are largely designed to fail the borrower ….  [Countrywide's] brokers can earn an extra 1 percent of the loan value in commission by adding a three-year prepayment penalty to loans.

35.      On or about March 10, 2008, the Federal Bureau of Investigation (the "FBI") disclosed that it had initiated a probe into the fraudulent mortgage practices engaged in by

Countrywide, including manipulation of the subprime and non-traditional loan markets, knowledge of and disregard for underwriting inaccuracies and misrepresentations, and specific instructions to underwriters by Countrywide not to scrutinize certain types of loans it issued. Subsequently, on April 2, 2008, a Federal Bankruptcy Judge overseeing the proceedings of more than 300 Countrywide-related bankruptcies ordered a further inquiry into the misconduct, and specifically, the illegal inflation of fees throughout the loan process that had been occurring at Countrywide.

36.     On April 11, 2008, a detailed amended complaint for violations of the federal securities laws was filed in federal court in the Central District of California against Countrywide.   In a decision dated December 1, 2008 (the "Countrywide Decision" or "Countrywide Dec."), Judge Mariana Pfaelzer of the U.S. District Court of the Central District of California upheld the bulk of that 416-page securities class action complaint, which detailed a massive fraud involving Countrywide.   Highlights of the Countrywide Decision include the following:

"From mid-2003 onward, Countrywide continually loosened its underwriting guidelines to the point of nearly abandoning them by 2006."  (Countrywide Dec., p. 7.)

In December 2007, Countrywide revealed that 89% ($64 bn.) of it's 2006 pay-option ARMs would not have been approved under its original underwriting guidelines, nor would 83% ($74 bn.) of its 2005 pay-option ARMs. (Countrywide Dec., p. 8.)

During the Class Period,[2] Countrywide "employed an internal, misleading definition of 'subprime,'" using a FICO score of 620 to delineate between prime and sub-prime instead of an industry-wide standard of 660.  (Countrywide Dec., p. 10.)

---

[2]     The Class Period in the Countrywide action is March 12, 2004 through March 7, 2008.

"Countrywide often waived its weakened standards, routinely approving loans that fell well outside its guidelines … It's goal was to [a]pprove virtually every borrower and loan profile…"  (Countrywide Dec., p. 11.)

Throughout the Class Period, appraisals were inflated (Countrywide Dec., pp. 13-14), salaries for no-doc loan applications were inflated (Countrywide Dec., pp. 14-15), and loan-to-value ratios were understated (Countrywide Dec., p. 16), all unbeknownst to the public.

Citing a "Price Any Loan system" of underwriting and "Countrywide's internal documents that systematically encouraged approving virtually any loan with additional 'add-on' fees," the court rejected motions to dismiss the fraud claims against senior Countrywide officers.  (Countrywide Dec., p. 89.)

"Plaintiffs describe a unified course of abandoning sound [loan] underwriting practices."  (Countrywide Dec., p.38.)

Plaintiffs persuasively alleged a pattern of "systematically lowering, avoiding and undermining guidelines while approving low-quality mortgages as 'prime'". (Countrywide Dec. p. 85.)

37.     Summarizing the complaint's allegations regarding Countrywide's core mortgage-related operations, the court observed:

Plaintiffs have created a cogent and compelling inference of a company obsessed with loan production and market share with little regard for the attendant risks, despite the company's **repeated assurances to the market**. With respect to loan origination practices, they raise strong inferences that (1) borrower requirements were progressively loosened over the Class Period; (2) in many instances, the actual loan quality was lower than the borrower's FICO score and LTV ratio suggested because Countrywide misrepresented how lax its verification practices became; and (3) Countrywide management routinely circumvented the normal underwriting process by approving highly risky loans for sale into the secondary market.

Countrywide Decision, at 78 (emphasis added).

38.     The Countrywide securities fraud complaint identified specific deviations for Countrywide's stated underwriting guidelines.   For example, in connection with the "No Income/No Asset Documentation Program," Countrywide represented that "[t]his program is limited to borrowers with excellent credit histories."  However, Countrywide routinely extended

these loans to borrowers with weak credit, and knew that such "low doc" or "no doc" loans, particularly when coupled with nontraditional products like ARMs, were highly likely to contain misinformation from the borrower, such as overstated incomes, that might result in increased defaults.  Because borrowers were advised that their representations on loan applications would not be verified, Countrywide employees referred to these products as "liar loans."

39.     On April 30, 2008, *The Wall Street Journal* reported on a federal probe of Countrywide that uncovered evidence of executives deliberately overlooking inflated income figures for many borrowers.  Indeed, Countrywide's "Fast and Easy" mortgage program, in which borrowers were asked to provide little or no documentation of their finances, was particularly prone to abuse by loan offices and outside mortgage brokers.  *See* "Countrywide Loss Focuses Attention on Underwriting – Evidence of Abuses By Outside Brokers; A Fraud in Alaska," *The Wall Street Journal*, April 30, 2008.

40.     On May 7, 2008, The New York Times published a tongue-in-cheek article entitled "A Little Pity, Please, for Lenders," that shifted the onus to borrowers for the current residential mortgage crisis.  In particular, the article noted that low documentation and stated documentation loans – e.g., Countrywide's No Income/No Assets Program and Stated Income/Stated Assets Program – have "became known within the mortgage industry as "liar loans" because many of the borrowers falsified their income."  However, these relaxed loan programs were created and promoted by aggressive lenders looking to amass volume loans for securitizations.

41.     In addition to ongoing SEC, FBI and Federal Trade Commission ("FTC") investigations, the Attorneys General of California, Florida and Illinois all launched

investigations of Countrywide for deceptive business practices relating to its mortgage lending, and more recently, both California and Illinois have commenced lawsuits against Countrywide.

42.     *The New York Times* reported that the Illinois Attorney General initiated a lawsuit against Countrywide and Angelo Mozilo, Chairman of the Board and Chief Executive Officer through July 1, 2008, contending that the company and its executives defrauded borrowers in the state by selling them costly and defective loans that quickly went into foreclosure.  The lawsuit accuses Countrywide and Mozilo of relaxing underwriting standards, structuring loans with risky features, misleading consumers with hidden fees and marketing claims, and creating incentives for its employees and brokers to sell questionable loans.  As the Illinois Attorney General explained, "[t]his mounting disaster has had an impact on individual homeowners statewide and is having an impact on the global economy.  It is all from the greed of people like Mozilo."

43.     *The New York Times* reported that the complaint, derived from 111,000 pages of Countrywide documents and interviews with former employees, "paints a picture of a lending machine that was more concerned with volume of loans than quality."  *See* Gretchen Morgenson, "Illinois to Sue Countrywide," *The New York Times,* June 25, 2008.

44.     As reported in the June 26, 2008 edition of *The New York Times*, California filed a similar lawsuit against Countrywide and Mozilo, accusing defendants of engaging in unfair trade practices that encouraged homeowners to take out risky loans, regardless of whether they could repay them.  Jerry Brown, California's Attorney General, stated: "Countrywide exploited the American dream of homeownership and then sold its mortgages for huge profits on the secondary market."

45.     On July 24, 2008, *The Los Angeles Times* reported that "three big Southland lenders (are) under federal investigation; Sources say IndyMac, Countrywide and New Century

[have been] subpoenaed." *The Los Angeles Times* further reported that officials have begun to

investigate whether investors were defrauded by the value of mortgage-backed securities:

> A federal grand jury in Los Angeles has begun probing three of the nation's largest subprime mortgage lenders in the clearest sign yet that prosecutors are investigating whether fraud and other crimes contributed to the mortgage debacle.
>
> ***Grand jury subpoenas have been issued in recent weeks and months to Countrywide Financial Corp., New Century Financial Corp. and IndyMac*** Federal Bank seeking a wide range of information, according to sources with direct knowledge of the subpoenas.
>
> People familiar with the situation told The Times that the subpoenas seek e-mails, phone bills and bank records and follow interviews that federal investigators have conducted with employees and others knowledgeable about the lending operations of the three Southern California institutions, which all collapsed under the weight of bad loans.
>
> ***In the case of Countrywide, the sources said, investigators have also begun looking into news reports that the firm and its former chairman, Angelo Mozilo, gave mortgage breaks to members of Congress and other influential "friends of Angelo," including Richard Aldrich, an associate justice of the California Court of Appeal.***
>
> The investigations are part of a coordinated Justice Department effort that until now has focused primarily on smaller operators suspected of defrauding homeowners and mortgage lenders.
>
> The subpoenas, while indicating that the effort is still at an early stage, show that the government is starting to take aim at the largest lenders and their executives to determine whether they were complicit in the multibillion-dollar mortgage crisis. The sources familiar with the subpoenas spoke on condition of anonymity because they were not allowed to discuss them publicly.
>
> The mortgage losses have regulators and law enforcement personnel gearing up for what experts say could prove to be the biggest financial fraud case since the savings and loan crisis of the 1980s.
>
> ***Officials have said they are beginning to investigate whether securities investors were defrauded about the value of subprime mortgages they purchased, as well as other possible crimes such as insider trading by corporate officials who sold stock knowing their holdings were about to deflate in value.***

(Emphasis added).

46.     As reported in the October 6, 2008 edition of *The New York Times*, Countrywide agreed to commit $8.4 billion in loan aid as part of a settlement with the Attorneys General of eleven states, including Illinois and California, which brought suit against Countrywide alleging that the bank engaged in predatory lending practices.  The settlement provides a program by which existing loans would be modified:

> [B]orrowers were placed in the riskiest loans, including adjustable-rate mortgages whose interest rates reset significantly several years after the loans were made. Pay-option mortgages, under which a borrower must pay only a small fraction of the interest and principal, thereby allowing the loan balance to increase, also are included in the modification.

### 2.     Disclosures Relating To IndyMac's Deficient Lending Practices

47.     Following the issuance of the Certificates collateralized by mortgages originated by IndyMac, delinquency and foreclosure rates on the underlying loans skyrocketed.  The large increases in delinquency and foreclosure rates resulted in substantial downgrades of the Certificates by Moody's and S&P in 2009.  In making these substantial downgrades, the Ratings Agencies cited, in part, "aggressive underwriting practices."

48.     IndyMac's growth was propelled by its utilization of Alt-A, stated-income high CLTV/piggyback and negative/interest only amortizing loans.  Alt-A loans are those loans offered to applicants who lack proof of income from traditional employment, such as investors or self-employed borrowers.

49.     By the third quarter of 2006, IndyMac was the top Alt-A lender nationwide, earning the nickname "the kingpin of Alt-A loans."  IndyMac had originated more than $49 billion in Alt-A production, representing 77.5% of IndyMac's total origination volume.  *See* Zelman Credit Suisse Analyst Report, "Mortgage Liquidity du Jour: Underestimated No More," March 12, 2007.

50.    In response to media sources' characterization of IndyMac as a subprime lender, IndyMac issued a press release on March 15, 2007 claiming it had been inappropriately categorized.  IndyMac stated that it is primarily a prime/Alt-A mortgage lender with minimal exposure to the subprime market.  Further, IndyMac maintained that subprime mortgages generally include loans where the borrower's FICO score is 620 or below and that their customer's average score was 701 in 2006.

51.    Soon after IndyMac's press release, CNNMoney.com published the article "'Liar's Loans': Mortgage Woes Beyond Subprime," which disclosed that there was a growing indication that Alt-A mortgages issued by lenders, such as IndyMac, "could be the next threat to the troubled real estate market – and the economy."

> NEW YORK (CNNMoney.com) -- Subprime mortgages have been generating a lot of attention, and worry, among investors, economists and regulators, but those loans may be only part of the threat posed to the housing market by risky lending.
>
> Some experts in the field are now concerned about the so-called Alt.-A mortgage loan market, which has grown even faster than the market for subprime mortgage loans to borrowers with less than top credit.
>
> Alt-A refers to people with better credit scores (A-rated) who borrow with little or no verification of income, or so-called alternative documentation.
>
> But some people in the industry call them "stated income" loans, or worse, "liar loans."  And they were an important part of the record real estate boom of 2004 and 2005 that has recently shown signs of turning into a bust.
>
> *            *            *
>
> ***Inside Mortgage Finance's Cecala said he believes underwriting of the loans had grown too loose by the end of last year, and that even some subprime borrowers were getting so-called low-doc or no-doc loans.  He believes as much as a quarter of Alt.-A loans were going to subprime borrowers.  "In some ways it's the worst possible combination," he said.***
>
> Now with the market correcting, even some borrowers with good credit are having Alt. A loan applications rejected, Ohlbaum said.  That will cut off another source of financing for the battered real estate market.

The biggest Alt-A lender is Pasadena, Calif-based IndyMac Bancorp. Trade publication Inside Mortgage Finance estimates it did $70.2 billion of the loans in 2006, up 48 percent from a year earlier. As the sector grew, its shares shot up nearly 50 percent in a year and hit a record high in April 2006. But with rising concern about the mortgage sector, its shares have plunged 36 percent since the start of 2007.

52.     On March 21, 2007, *Housing Market* published an article entitled "US Housing Market – IndyMac – We are Not a Subprime Lender!" which criticized the differentiation between subprime and Alt-A provided by IndyMac. IndyMac's key differentiating factor – the borrower's FICO score – "is hardly the root cause of the escalating subprime defaults," but rather "[t]he problem lies in the type of loans that have been originated." The article described IndyMac's Alt-A loans as "Liar Loans" since income is taken as fact:

> No further documentation is required. As long as the automated property appraisal software is functioning, approval is only a few keystrokes away. ***These loans are tremendously profitable, since the underwriting costs are much lower and the rates are higher than a standard 30 year fixed mortgage.***

53.     IndyMac's use of piggyback loans, as part of its Alt-A loan production, was equally as risky. It was only after the Offering that IndyMac first separated out its loan production to include a delineation of piggyback loans, which showed that a significant portion of IndyMac's loan production was risky 80/20 piggyback mortgage loans.

54.     In response to IndyMac's risky loan preferences, Moody's announced that it would begin modeling Alt-A loans as subprime loans absent strong compensating factors. The rating agency had found that "[a]ctual performance of weaker Alt-A loans has in many cases been comparable to stronger subprime performance, signaling that underwriting standards were likely closer to subprime guidelines." "Moody's Says Some 'Alt-A' Mortgages Are like Subprime," *Bloomberg News*, July 31, 2007.

55.     On August 20, 2007, an article in *Business Week* entitled, "Did Big Lenders Cross the Line? Law Suits Assert Some Firms Doctored Loan Documents," provided glaring examples of IndyMac's loose underwriting and aggressive mortgage lending practices.   The article discussed the disturbing story of Elouise Manuel, where an IndyMac underwriter directed that certain income documentation in her stated-income loan application be blacked-out in order for the loan to be approved.  The conditional approval letter from IndyMac even informed the loan applicant that to be approved it needed "[Social Security] benefits letters for the last two years with income blacked out."  Ultimately, Ms. Manuel was unable to pay the loan, and subsequently lost her home.

56.     These types of stated-income loans were the easiest to manipulate, and the easiest for IndyMac to follow through on due diligence had it so desired.  IndyMac could have insisted on double-checking a client's stated income by utilizing IRS Form 4506.  When asked by analysts during the November 2, 2006 Conference Call, as to what percentage of IndyMac's Alt-A customers provided IndyMac with IRS Form 4506, Michael W. Perry ("Perry"), Chairman of IndyMac Bancorp, Inc.'s Board of Directors and Chief Executive Officer was evasive and non-responsive.   Indeed, studies have confirmed that upwards of 90% of stated-income loan borrowers exaggerated their stated income by over 50%.  "Eighth Periodic Mortgage Fraud Case Report to Mortgage Bankers' Association," produced by Mortgage Asset Research Institute, Inc., April 2006.

57.     In its Letter to Shareholders, contained in IndyMac Bancorp's 2007 Annual Report, dated February 12, 2008, IndyMac Bancorp Chairman and CEO Perry "[took] full responsibility for the mistakes [IndyMac] made," indicating that IndyMac's "innovative home lending went too far" and resulted in a "'systemic' underestimation of credit risk."  Perry also

confirmed that once "we began to realize [the systemic underestimation of credit risk], we tightened our [underwriting] guidelines throughout the last year…."

Dear shareholders,

2007 was a terrible year for our industry, for IndyMac and for you, our owners. …

\*      \*      \*

Who is to blame for the mortgage industry's financial losses and also the record number of Americans losing their homes?

*All home lenders, including Indymac, were a part of the problem, and, as Indymac's CEO, I take full responsibility for the mistakes that we made… Most of us believed that innovative home lending served a legitimate economic and social purpose, allowing many U.S. consumers to be able to achieve the American dream of homeownership … and we still do.* Homeownership is the main way we Americans accumulate wealth, and, in fact, a recent Federal Reserve Bank study shows that homeowners on average have 46 times the personal wealth of renters.

*As innovative home lending and loan products became more widespread, the result was more people succeeding (in homeownership) and more people failing (losing their home) than ever before. …*

*However, in retrospect, like many innovations (e.g., the Internet, railroads, etc.), innovative home lending went too far…*

\*      \*      \*

*… Automated risk-based models, on which the entire market relied, replaced portions of traditional underwriting and credit evaluation, and only in retrospect is it now clear that these models did not perform as predicted during a period of severe economic stress.  As events unfolded, this proved to be particularly the case with respect to programs such as piggyback loans and high LTV cash-out refinance transactions, including home equity and second mortgages.*

*The bottom line of the housing crisis for Indymac and its leadership team.  As I said earlier, I take full responsibility for the errors we made at Indymac…*

IndyMac 2007 Annual Report, Letter to Shareholders, pp. 1-9 (emphasis added).

58.     On June 6, 2008, a detailed amended complaint was filed in federal court in the Central District of California against IndyMac and Perry, for violations of the federal securities laws.   As alleged, IndyMac issued numerous materially false and misleading statements regarding the company's strong internal controls and underwriting practices.   In reality, however, IndyMac's internal controls were grossly deficient.   According to the IndyMac complaint, IndyMac's management, including Perry, exploited internal control weaknesses or overrode controls to drive loan originations and sales growth.

59.     For example, a former IndyMac vice-president states Perry sought to make his short term goals for the company "at all costs."   To this end, Perry put immense pressure on subordinates to "push loans through," even if it meant consistently making "exceptions" to the company's guidelines and policies.   According to confidential witnesses, the following practices, which were contrary to stated IndyMac guidelines, were employed to close loans: (a) intentionally manipulating software used to compute loan eligibility; (b) violating stated rate lock protocols and controls; and (c) disregarding underwriting guidelines generally, with a focus on growing loans without the required documentation.   On January 13, 2009, the Honorable George H. Wu, United States District Judge for the Central District of California, indicated that the federal securities law violations against IndyMac's CEO Perry will move forward.

60.     As reported by *CNNMoney.com* on July 11, 2008, the Federal Deposit Insurance Corporation (the "FDIC") shut down IndyMac Bancorp and operations were taken over by federal regulators.   At the center of IndyMac's demise was its focus on Alt-A loans that it had long argued were of minimal risk.   In that same article, CNNMoney.com discussed how IndyMac had gotten to this point:

**IndyMac specialized in loans it had long argued were of minimal risk: low documentation loans to residential mortgage borrowers.**

23

On Tuesday, IndyMac - which had 33 branches - announced that it was firing 53% of its workforce and exiting its retail and wholesale lending units. Last year, the lender was ranked 11th in residential mortgage origination, according to trade publication Inside Mortgage Finance.

*     *     *

IndyMac lost $184.2 million in the first quarter and announced on Monday that it was expecting a wider loss for the second quarter.  It lost $614 million last year stemming from its focus on the Alt-A mortgage sector, where it originates loans to borrowers who fall between prime (or conforming) and sub-prime on the credit spectrum.  The lender's chief executive, Michael Perry, had long argued that it was being unfairly punished given its relatively paltry exposure to sub-prime mortgages.

Rising Alt-A and prime mortgage delinquencies likely were enough indication for investors that the housing crisis had moved beyond the weakest borrowers.  Even worse, with the securitization markets in collapse, IndyMac had no way to get new loans off its books.  As it turned out, IndyMac was a leader in loans requiring little income and asset documentation, a category that has had disastrous levels of delinquencies at other troubled lenders.  What loans the bank had made recently were to borrowers with well-documented assets and income, but those are sharply less profitable with respect to fees and interest income.

(Emphasis added).

**Negative Disclosures Relating To The Underwriter**
**Defendant's Role In The Collapse of the MBS Markets**

61.     On December 10, 2007, UBS AG announced that it had incurred massive losses in connection with the ailing subprime markets in the United States, resulting in it taking a $10 billion write-down in its mortgage-backed related investments, and selling over $11 billion of its mortgage-backed investments to the Government of Singapore and Middle-Eastern investors with the hopes of recapitalizing.

62.     On December 24, 2007, as reported on the Dow Jones Newswire, Swiss regulators announced that the Swiss banking department charged with oversight of the Country's

investment banks, would be initiating a full investigation into how UBS incurred such massive losses in connection with risky U.S. subprime and alt-A home loans.

63.    By as early as the middle of January 2008, UBSSEC was already disclosing to investors that it expected additional losses in the first quarter of 2008 due to the Bank's U.S. subprime mortgage exposure, mainly due to an additional $4.5 billion in write-downs of mortgage-backed and related securities.

64.    On April 25, 2008, UBS presented Swiss banking regulators with a detailed and explicit 50-page report, which was censored for public release, detailing how the Bank lost such massive amounts of shareholder value and money so quickly by investing in U.S. subprime mortgage products.  One of the many conclusions the report reached was that UBS, just like many of the other Underwriter Defendant banks herein, was that UBS was acquiring huge portfolios of U.S. subprime assets from failing businesses that the Bank was acquiring in early 2007.  Such portfolios were being acquired by investment banks such as UBS who did not have the proper risk controls to monitor and evaluate the actual risk and benefits involved.

65.    In response to the release of the report, mortgage-related securities that had been underwritten and/or issued by UBS were downgraded by U.S. rating agencies, specifically the 2006-QO5 and 2006 QO7 series.

66.    On May 7, 2008, just after the release of the report to the Swiss regulators, UBS announced a first quarter 2008 loss of $11 billion, and its plan to cut over 5,000 jobs at the Bank. Having incurred over $37 billion in U.S. mortgage related write-downs, UBS announced that it was exiting the U.S. housing market completely.

67.    Nevertheless, in August 2008, UBS announced significant losses in the second quarter of 2008, resulting from $5.1 billion in U.S. mortgage related write-downs.

68.    In connection with the Offering, UBSSEC conducted substandard and deficient due diligence, including in connection with the underwriting standards used to originate the Certificate collateral.

**Governmental Agency Investigations and Subsequent**
**Findings Related to the Residential Mortgage Industry**
**Evidence Faulty Loan Origination and Securitization**

69.    In August 2007, following reports of defaults in mortgage loans underlying various MBS, downgrades of such MBS and potential downgrades of additional MBS in the future, and the resulting illiquidity in the credit markets, the President of the United States commissioned the Secretary of the Treasury, the SEC and the Commodities Futures Trading Commission (the "CFTC") (hereinafter referred to as the "President's Working Group") to investigate the causes of the market turmoil.  After a seven-month investigation, the President's Working Group issued its report on March 13, 2008.  The President's Working Group found:

- A significant erosion of market discipline by those involved in the securitization process, including *originators, underwriters, credit rating agencies, and global investors,* related in part to failures to provide or obtain adequate risk disclosures;

- The turmoil in financial markets clearly was triggered by a *dramatic weakening of underwriting standards for U.S. subprime mortgages…*

(Emphasis added).

70.    Further, as noted, relatively soon after issuance, the delinquency and foreclosure rates of the Certificate collateral began to increase.  This performance was an indication to S&P of pervasive underwriting failures in the origination of the collateral which ultimately led to widespread and deep downgrades of most of the Certificate classes.  On or about July 10, 2007, S&P publicly announced it was revising the methodologies used to rate numerous RMBS Certificates because the performance of the underlying collateral "called into question" the

accuracy of the loan data.  This announcement triggered several governmental investigations which only began reporting their findings in 2008.

71.     S&P announced that it was revising its methodology assumption to require increased "credit protection" for rated transactions.  S&P reiterated that it would also seek in the future to review and minimize the incidence of potential underwriting abuse given "the level of loosened underwriting at the time of loan origination, misrepresentation and speculative borrower behavior reported for the 2006 ratings."

72.     One day later, on July 11, 2007, Moody's announced it also was revising its methodology used to rate the Certificates and anticipated Certificate downgrades in the future. Moody's did in fact significantly downgrade most of the Certificate classes, noting aggressive underwriting used in the origination of the collateral.

73.     Further, as set forth fully above, disclosures emerged well after the issuance of the Certificates with respect to the Originators which further evidenced that they had engaged in loan underwriting practices which were wholly inconsistent with the Guidelines set forth in the Registration Statement and Prospectus Supplement.

**The Offering Documents Failed to Disclose that MASTR**
**Relied on S&P and Moody's Outdated Models to**
**<u>Determine Levels of Credit Enhancement and Ratings</u>**

74.     The Prospectus Supplement describes the varying forms of credit enhancement, including by way of subordination and over-collateralization.  The Prospectus Supplement contain material misstatements and omissions of fact, including the failure to disclose that the amounts and forms of credit enhancement were understated and insufficient because they were largely determined by Ratings Agencies' models that had not been materially updated since 1999 (for S&P) and 2002 (for Moody's).  As a result, these outdated models were based primarily on

the performance of fixed interest loans and not subprime, Alt-A, no or limited documentation loans – which were the kinds of loans substantially included in the Certificate collateralizations. The models failed both to provide sufficient, appropriate credit enhancement and to disclose the deficiencies in the manner in which credit enhancement was determined.

75.     The Ratings Agencies' determinations of the amount and kind of credit enhancement to be included in the Certificates were faulty.  These same faulty determinations were then used by the same firms to assign inflated and faulty AAA ratings to a substantial portion of the total Certificate value of the Offering.  These ratings were unjustifiably high because they were determined pursuant to the same models used to determine credit enhancement – models that had not adequately been updated at the time the Certificates were issued.

76.     The truth about the Ratings Agencies' undisclosed use of outdated models in rating RMBS deals only began to emerge in 2008.  The inadequacy of the models used to rate (and determine the amount of credit enhancement needed to support the rating) was discussed in the April 2008 issue of *Mortgage Banking,* which explained that the Ratings Agencies' models used statistical assumptions that were too heavily based on the performance of 30-year-fixed mortgages, which were not the kinds of mortgages that had been securitized in the prior four years:

> S & P's Coughlin admits that "assumptions that went into decision-making [on credit ratings] were informed by what had happened in the past," and yet in this instance "previous loss data proved to be much less of a guide to future performance."

> But why?  Drexel University's Mason believes it's because the CRAs relied on statistical models that were misleading, at best.  "I think their [credit-rating] methodologies were demonstrably insufficient," he says.

"Unlike the traditional rating processes for single-named issuers, which rely on empirical analysis at their core, structured-finance rating analysis is essentially driven by statistical models," write Mason and Rosner in their paper.  And the data that the rating agencies used when evaluating mortgage-backed securities-- including those backed by subprime mortgages--were heavily biased by over-reliance on traditional 30-year fixed prime mortgage loans.  But it turns out that a subprime loan, as Mason explains during an interview, is a very different animal.

"This is not your historical mortgage loan," he says.  "This is more like a credit-card loan."  Mason cites the increased popularity during the mortgage boom of so-called option ARMs, which are home loans that give the borrower a variety of monthly payment options and have variable cash-flow characteristics that are more like credit cards.

77.    *The New York Times* noted, with respect to Moody's April 2007 disclosure, in an article published on April 8, 2008, that it was "revising" its model which had not been revised since 2002:

In April 2007, Moody's announced it was revising the model it used to evaluate subprime mortgages.  It noted that the model "was first introduced in 2002.  Since then, the mortgage market has evolved considerably."  This was a rather stunning admission; its model had been based on a world that no longer existed.

78.    The article explained that when Moody's had analyzed subprime delinquency data in 2007 it had found trends that its 2002 model never accounted for:

Poring over the data, Moody's discovered that the size of people's first mortgages was no longer a good predictor of whether they would default; rather, it was the size of their first and second loans – that is, their total debt – combined.  This was rather intuitive; Moody's simply hadn't reckoned on it.  Similarly, credit scores, long a mainstay of its analyses, had not proved to be a "strong predictor" of defaults this time.  Translation: even people with good credit scores were defaulting.  Amy Tobey, leader of the team that monitored XYZ, told me, "it seems there was a shift in mentality; people are treating homes as investment assets."  Indeed.  And homeowners without equity were making what economists call a rational choice; they were abandoning properties rather than make payments on them.  Homeowners' equity had never been as high as believed because appraisals had been inflated.

79.    On October 22, 2008, the House Oversight Committee heard testimony from Frank Raiter (the "Raiter Testimony"), the former Managing Director and head of RMBS at S&P

from March 1995 through April 2005.  Raiter testified that the ratings on S&P deals turn in part

on the credit rating of the individual mortgages.  It was from this credit analysis that S&P

determined *(1) the expected default probability* of a loan and *(2) the loss that would occur in*

*the event of a default* which, in turn, was used to establish the amount of AAA bonds that could

be issued against the pool and amount of equity or "credit enhancement" needed to protect the

AAA bonds from experiencing losses:

> A mortgage backed security consists of a pool of individual mortgage loans.
> Depending on the type of mortgage product (i.e., prime-jumbo, subprime, Alt-A
> or HEL) underlying a given security, the pool could consist of 1,000 to 25,000
> loans.  The ratings process consists of two distinct operations – the credit analysis
> of individual mortgages and a review of the documents governing the servicing of
> loans and the payments to investors in the securities.
>
> *The credit analysis is focused on determining the expected default probabilities*
> *on each loan and the loss that would occur in the event of a default.*  These, in
> turn, establish the expected loss for the entire pool and determine the amount of
> AAA bonds that can be issued against the pool.  It is analogous to your equity
> position in your home and the underlying mortgage.
>
> The loss estimate determines the equity needed to support the bond – it is
> intended to protect the AAA bonds from experiencing any losses, much the same
> as the homeowners' equity stake in a house protects the lender from loss in the
> mortgage loan.

Raiter Testimony, at 3 (emphasis added).

80.      Raiter testified that in 1995, S&P developed a sophisticated model to estimate the

default and loss of individual loans and pools – a model based on approximately 500,000 loans

with performance data going back five or more years.  This "LEVELS" Model was updated in

early 1999 based on a database of 900,000 loans.  Raiter testified further that *"it was critical to*

*maintain the best models as they were the linchpins of the rating process."*  Raiter Testimony,

at 4 (emphasis added).  After the housing boom took off in 2001, S&P developed a far better

model in 2001, with updated data in 2003 and 2004, based on approximately 9.5 million loans

*"covering the full spectrum of new mortgage products, particularly in AAA and fixed/floating*

*payment type categories."* (*Id*. (emphasis added.))

81.     Nevertheless, S&P failed to implement this updated model, which, in Raiter's

view, would have forewarned the loan losses from the new loan products, in particular:

> [T]he analysts at S&P had developed better methods for determining default
> which did capture some of the variations among products that were to become
> evident at the advent of the crisis.  It is my opinion that had these models been
> implemented we would have had an earlier warning about the performance of
> many of the new products that subsequently lead to such substantial losses.  That,
> in turn, should have caused the loss estimates mentioned above to increase and
> could have thus caused some of these products to be withdrawn from the market
> as they would have been too expensive to put into bonds.

Raiter Testimony, at 4.

82.     As Raiter explained, the unfortunate consequences of continuing to use outdated

versions of the rating model included "the failure to capture changes in performance of the new

non-prime products" and "the unprecedented number of AAA downgrades and subsequent

collapse of prices in the RMBS market."  Raiter Testimony, at 5.  S&P's current President,

Deven Sharma, agreed, noting in his October 22, 2008 testimony before the House Oversight

Committee, "[i]t is by now clear that a number of the assumptions we used in preparing our

ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of

2007 did not work…   [E]vents have demonstrated that the historical data we used and the

assumptions we made significantly underestimated the severity of what has actually occurred."

(*Id.*)

83.     Executives at Moody's also acknowledged a lack of investment in Moody's

ratings models and the failure of Moody's ratings models to capture the decrease in lending

standards.  In a confidential presentation to Moody's Board of Directors in October 2007,

released by the House Oversight Committee on October 22, 2008 during the Committee's

"Hearing on the Credit Agencies and the Financial Crisis" (the "House Oversight Committee Hearing"),[3] Raymond McDaniel, the current Chairman and CEO of Moody's, noted that underfunding can put ratings accuracy at risk and acknowledged that "Moody's Mortgage Model (M3) needs investment."  McDaniel also acknowledged that Moody's models did not sufficiently capture the changed mortgage landscape.  (*Id.*)  Brian Clarkson – Moody's former President and Chief Operating Officer – also recognized  during a Moody's Town Hall on September 10, 2007, the transcript of which was released during the House Oversight Committee Hearing on October 22, 2008, Moody's failure to incorporate decreased lending standards into their ratings, stating: "We should have done a better job monitoring that [decrease in underwriting standards]."

84.     Not only were Moody's and S&P's models based on outmoded data but they were often constructed by people who were not familiar with the housing markets in the areas that they were rating.  And, in some instances, real estate investments were graded by analysts who never actually reviewed the investment and who merely relied upon ratings assigned by a competitor ratings agency.

**The Ratings Agencies Relaxed the Ratings Criteria Which**
**Led to Artificially High Ratings Awarded to the Certificates**

85.     Moody's and S&P repeatedly eased their ratings standards in order to capture more market share of the ratings business.  In a September 25, 2008 article published by *Bloomberg*, titled "Race to Bottom at Moody's, S&P Secured Sub-prime's Boom, Bust," a former S&P Managing Director – Richard Gugliada – explained the easing of standards as a "'*market-share war where criteria were relaxed*'" and admitted, "'***I knew it was wrong at the time… [I]t was either that or skip the business***.  That wasn't my mandate.  My mandate was to

---

[3]     All exhibits released by the House Oversight Committee from the Committee's "Hearing on Credit Agencies and the Financial Crisis" can be found on the Committee's website at www.oversight.house.gov.

find a way.  Find the way.'"  (*Id.*) (Emphasis added).  According to Gugliada, when the subject of tightening S&P's ratings criteria came up, the co-director of CDO ratings, David Tesher, said: "Don't kill the golden goose."  (*Id.*)

86.    The loosening of ratings standards is exemplified by the following "instant message" conversation between Rahul Shah ("Shah") and Shannon Mooney ("Mooney"), two S&P analysts, from April 5, 2007, that described S&P's rating of an investment similar to the Trusts and that was submitted during the House Oversight Committee Hearing:

> **Shah:** btw – that deal is ridiculous
> **Mooney:** i know right ... model def does not capture half of the rish [sic]
> **Mooney:** *risk*
> **Shah:** we should not be rating it
> **Mooney:** we rate every deal
> **Mooney:** it could be structured by cows and we would rate it
> **Shah:** but there's a lot of risk associated with it – I personally don't feel comfy signing off as a committee member.

87.    In an email sent on December 5, 2006, released during the House Oversight Committee Hearing, an S&P analytical manager in the same group as Shah and Mooney wrote to a senior analytical manager that the "[r]ating agencies continue to create and [sic] ***even bigger monster – the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters***." (Emphasis added).

88.    On October 28, 2008, former Moody's Managing Director Jerome S. Fons ("Fons") testified before the House Oversight Committee (hereinafter "Fons Testimony").  Fons had been an Executive at Moody's for 17 years, in various positions including Managing Director of Credit Policy.  Fons testified that due to profit concerns, a loosening of ratings standards took place at his company: "[T]he focus of Moody's shifted from protecting investors to being a marketing-driven [sic] organization" and "management's focus increasingly turned to maximizing revenues" at the expense of ratings quality.

89.     Fons explained that the originators of structured securities were free to shop around for the ratings agency that would give them the highest rating and ***"typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality."*** Fons Testimony, at 3 (emphasis added).  Fons noted that the ratings agencies' "drive to maintain or expand market share made [them] willing participants in this [ratings] shopping spree" and made it "relatively easy for the major banks to play the agencies off one another."  (*Id.*)  Fons said it was this business model that ***"prevented analysts from putting investor interests first."*** (*Id.*) (Emphasis added.)

90.     Raymond McDaniel, the current CEO of Moody's, also acknowledged the degradation of ratings standards.  In the same confidential presentation to Moody's Board of Directors in October 2007, cited *supra*, McDaniel told the Board: "The real problem is not that the market ... underweights ratings quality but rather that in some sectors, it actually penalizes quality .... It turns out that ***ratings quality has surprisingly few friends."*** (*Id.*) (Emphasis added.) He noted the pressure exerted on analysts to come up with high ratings, explaining "[a]nalysts and MDs [managing directors] are continually 'pitched' by bankers, issuers, investors" and sometimes "we 'drink the kool-aid.'" (*Id.*)   In fact, *The Wall Street Journal,* in an article published on April 24, 2007, found that in at least one instance, Moody's increased the proportion of AAA ratings within a mortgage after its client complained and said it might go with a different ratings agency.

**The Prospectus Supplement Did Not Reflect the True Risk of the Certificates**

91.     The Ratings Agencies rated the Certificates based in large part on data about each mortgage loan that MASTR and/or UBSRES provided to them – including appraisal values, LTV ratios, borrower creditworthiness, required levels of documentation provided by borrowers used

verify assets and/or income levels and quality control or oversight procedures followed by the Originators in underwriting the mortgage loans.  As discussed above, much of this data was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation, disregard of Originator internal controls and procedures in addition to other facets of defective underwriting addressed in this Complaint.  Not only did UBSSEC fail to conduct proper due diligence, as set forth above, but neither Moody's nor S&P engaged in any due diligence or otherwise sought to verify the accuracy or quality of the loan data underlying the pools they rated (and specifically disclaimed any due diligence responsibilities).  Nor did they seek representations from sponsors that due diligence had been performed.  During Moody's September 2007 "Town Hall Meeting," hosted by Moody's Managing Director, Raymond McDaniel, executives at Moody's acknowledged that the Ratings Agencies used inaccurate data to form their ratings:

> We're on notice that a lot of things that we relied on before just weren't true ... [W]e relied on reps and warrantees that no loans were originated in violation of any state or federal law.  We know that's a lie.
>
>         *        *        *
>
> There's a lot of fraud that's involved there, things that we didn't see ... We're sort of retooling those to make sure that we capture a lot of the things that we relied on in the past that we can't rely on, on a going forward basis.
>
>         *        *        *
>
> [W]e're being asked to figure out how much everyone lied... [I]f all of the information was truthful and comprehensive and complete, we wouldn't have an issue here…
>
> What we're really being asked to do is figure out how much lying is going on and bake that into a credit ... which is a pretty challenging thing to do.  I'm not sure how you tackle that from a modeling standpoint.

Moody's Town Hall Meeting Transcript, at 16, 58.

92.     In response to the "Town Hall Meeting," a Moody's employee noted:

[W]hat really went wrong with Moody's sub prime ratings leading to massive leading to massive downgrades and potential more downgrades to come? We heard 2 answers yesterday: 1. people lied, and 2. there was an unprecedented sequence of events in the mortgage markets.  As for #1, it seems to me that *we had blinders on and never questioned the information we were given.* Specifically, why would a rational borrower with full information sign up for a floating rate loan that they couldn't possibly repay, and why would an ethical and responsible lender offer such a loan?  *As for #2, it is our job to think of the worst case scenarios and model them ... Combined, these errors make us look either incompetent at credit analysis, or like we sold our soul to the devil for revenue, or a little bit of both.*

Moody's Town Hall Meeting Transcript, at 79 (emphasis added).

93.     Because Moody's and S&P were using flawed information and models to generate their ratings, the ratings assigned to the Certificates did not accurately reflect their risk, and the Certificates were given investment-grade ratings when in reality they were not of investment grade quality.  These artificially high ratings, which were published in the Prospectus Supplement, were materially misleading in that they did not reflect the true risk of the Certificates.

**The Offering Documents Failed to Disclose "Ratings**
**Shopping" Practices Used to Engage the Ratings Agencies**

94.     The Registration Statement disclosed the engagement of Ratings Agencies but omitted disclosure of the manner in which the Ratings Agencies were engaged – so-called "ratings shopping."  As noted, the July 2008 SEC Report set forth that S&P and Moody's engaged in the practice of "ratings shopping," as indicative of one of the practices which may have pressured Ratings Agencies to issue faulty ratings for MBS.

95.     In June 2008, the NYAG announced that after an investigation of the Ratings Agencies in the MBS context, it had reached an agreement with S&P, Moody's and Fitch which contemplated a complete overhaul of the then-current ratings procedures and guidelines and to

put an end to what had been termed "ratings shopping."  Instead of investment banks looking to

issue mortgage-backed bonds going to all three agencies for a review, but only use, and pay for,

the most optimistic rating, the agencies now will get paid up front regardless if they are hired to

assign a rating, a move expected to remove any potential for conflicts of interest.

     96.    As set forth above, in Fons' Testimony before the House Oversight Committee,

he explained that Moody's provided inadequate ratings on RMBS because of conflicts of interest

and being forced to "bid" or "shop" its ratings to obtain engagements:

> Why did it take so long for the rating agencies to recognize the problem?  Why
> were standards so low in the first place?  And what should be done to see that this
> does not happen again?
>
> ***My view is that a large part of the blame can be placed on the inherent conflicts
> of interest found in the issuer-pays business model and rating shopping by
> issuers of structured securities.***  A drive to maintain or expand market share
> made the rating agencies willing participants in this shopping spree.  It was also
> relatively easy for the major banks to play the agencies off one another because of
> the opacity of the structured transactions and the high potential fees earned by the
> winning agency.  Originators of structured securities typically chose the agency
> with the lowest standards, engendering a race to the bottom in terms of rating
> quality.  While the methods used to rate structured securities have rightly come
> under fire, in my opinion, the business model prevented analysts from putting
> investor interests first.

Fons Testimony, at 3 (emphasis added).

     97.    In further testimony at the October 22, 2008 House Oversight Committee

Hearing, Sean J. Egan ("Egan"), Managing Director of Egan-Jones Rating Co., stated, in part:

> Assigning ratings on structured finance bonds differs from the process for
> corporate and municipal bonds.  In the unsecured corporate and municipal
> markets, debt issuers are subject to being rated by all of the rating agencies
> because financial information is publicly available to all parties.  The structured
> finance market has been a "rating by request" market where the debt issuers invite
> some or all of the major rating agencies to preview the collateral pools so the
> rating agencies can provide preliminary rating indications that can be used to size
> the bond classes and structure the bond transactions.
>
> ***Historically, all of the rating agencies have agreed to bow out of the rating
> process if they are not actually selected by the debt issuer to rate a securities***

37

*transaction. **This has encouraged the debt issuers to shop for the best ratings so they can optimize their securitization proceeds.***

House Oversight Committee Hearing, October 22, 2008, Egan Testimony, at 9 (emphasis added).

**The Offering Documents Failed to Disclose the True
Roles of Ratings Agencies in Forming and Structuring
the Certificates for Sale as Primarily AAA Securities**

98.     An article appearing in *The Financial Times* on October 17, 2008, entitled "When Junk Was Gold," addressed the unique role of the Ratings Agencies in structured finance deals such as mortgage backed securities:

> The first mortgage-backed bonds were created in the late 1980's, well before Clarkson's time, by a trader called "Lewie" Ranieri.  Ranieri, the head of the mortgage trading desk at the former investment bank Salomon Brothers, was famous for the huge sums of money he netted for his employer and for the quantity of cheeseburgers he ate.  What he struck upon in structured finance was a process of pure alchemy: a way of turning myriad messy mortgage loans into standardized, regimented and easy-to-assess bonds.
>
> Ranieri knew that the magic of structuring was in the packaging.  Packaged in the right way, mortgages could come to create a huge, new tradable bond market.  And this is where the rating agencies came in.  Structured bonds, like any other bond, needed ratings in order to be sold.  ***But with a structured bond, the pools of debt could be built or modified in order to attain a particular rating.  This wasn't a matter of disguising the risk, rather a way of reapportioning it and allowing investors with different risk appetites to buy the right product for them.  "The rating is what gives birth to the structure in the first place," explains Sylvain Raynes, a financial modeling expert who was with Moody's in the 1990s, when Clarkson joined.  In some cases, the ratings are known before the bonds have even been inked.  "You start with a rating and build a deal around a rating," Clarkson told an investment magazine last year.***

(Emphasis added).

99.     The Ratings Agencies' unique role in influencing the structure of the securitization was more fully discussed in the July 2008 SEC Report.  The July 2008 SEC Report confirmed that S&P and Moody's provided "feed back" to the Sponsor of the Offering as to the structure, which would result in the highest rating:

The three examined rating agencies generally followed similar procedures to develop ratings for subprime RMBS and CDOs. ***The arranger of the RMBS initiates the ratings process by sending the credit rating agency a range of data on each of the subprime loans to be held by the trust (e.g., principal amount, geographic location of the property, credit history and FICO score of the borrower, ratio of the loan amount to the value of the property and type of loan: first lien, second lien, primary residence, secondary residence), the proposed capital structure of the trust and the proposed levels of credit enhancement to be provided to each RMBS trance issued by the trust. Typically, if the analyst concludes that the capital structure of the RMBS does not support the desired ratings, this preliminary conclusion would be conveyed to the arranger. The arranger could accept that determination and have the trust issue the securities with the proposed capital structure and the lower rating or adjust the structure to provide the requisite credit enhancement for the senior tranche to get the desired highest rating. Generally, arrangers aim for the largest possible senior tranche, i.e., to provide the least amount of credit enhancement possible, since the senior tranche – as the highest rated tranche – pays the lowest coupon rate of the RMBS' tranches and, therefore, costs the arranger the least to fund.***

July 2008 SEC Report, at 22 (emphasis added).

**The Offering Documents Failed to Disclose Material Financial Conflicts
of Interest between UBS and the Ratings Agency Defendants**

100.   The Offering Documents make no mention of the material financial conflicts of interest between MARM and the Ratings Agency Defendants, including the fact that the analysts involved in rating were also involved in the rating fees or the Ratings Agencies' business interests. The July 2008 SEC Report confirmed significant undisclosed conflicts of interest which gave the Ratings Agencies an incentive to issue inflated ratings. The July 2008 SEC Report found, in violation of SEC Rules, that "key participants" in the securitization process negotiated fees the Ratings Agency would receive in exchange for its high ratings. July 2008 SEC Report, at 23-24.

101.   The July 2008 SEC Report also noted, *inter alia*, that analysts are "aware" of the rating firm's "business interests when securing the rating of the deal" as follows:

- ***While each rating agency has policies and procedures restricting analysts from participating in fee discussions,*** these policies still allowed key participants in the ratings process to participate in fee discussions.

- Analysts appeared to be aware, when rating an issuer, of the rating agency's business interest in securing the rating of the deal.  The Staff notes multiple communications that indicated that some analysts were aware of the firm's fee schedules, and actual (negotiated) fees.  There does not appear to be any internal effort to shield analysts from emails and other communications that discuss fees and revenue from individual issuers.

- ***"Rating agencies do not appear to take steps to prevent considerations of market share and other business interests from the possibility that they could influence ratings or ratings criteria."***

July 2008 SEC Report, at 24-25 (emphasis added).

102.    The July 2008 SEC Report found that a number of factors unique to the rating of RMBS may have "exacerbated" the effect of conflicts of interest inherent in the fact that the issuer or arranger pays for the ratings.  These factors include that the arranger of the deal has:

- ***"More flexibility to adjust the deal to obtain a desired credit rating as compared to arrangers of non-structured asset classes."***

- "Second, there is a high concentration in the firms conducting the underwriting function…   While 22 different arrangers underwrote subprime RMBS deals, 12 arrangers accounted for 80% of the deals, in both number and dollar volume."

- With a fast-changing market, rating processes are frequently and quickly changed.   The high concentration of arrangers with the influence to determine the ***choice of rating agency heightened the inherent conflicts in the "issuer pays" compensation model.***  Compensation is calculated by volume of deals and total dollar volume, as a result arrangers prefer fast and predictable ratings processes.

- Ratings Agencies may be pressured by arrangers to produce a more ***favorable outcome or reduce credit enhancement levels,*** thus reducing ***the cost of the debt for a given level of cash inflows from the asset pool.***  When the arranger also sponsors the RMBS or CDO trust, pressure can influence an agency's decision to update a model when the update would lead to a less favorable outcome.

- ***High profit margins may have provided an incentive for rating agencies to encourage the arrangers to route future business its way.*** Unsolicited ratings were not available to provide independent checks on the rating agencies' ratings, nor was information regarding the structure of the security or portfolio of assets readily available to parties unrelated to the transaction, especially before issuance.

July 2008 SEC Report, at 31-33 (emphasis added).

103.    As reported in *The Washington Post* on June 6, 2008, the NYAG announced that it had reached an agreement with the credit-rating companies, S&P, Moody's and Fitch to:

… change the way they evaluate mortgage securities that have roiled financial markets for the past year.

The deal with Moody's Investors Service, Standard & Poor's and Fitch Ratings aims to restore confidence among investors -- who saw top-rated securities lose much of their worth in a matter of months -- by revising how the agencies are paid for issuing ratings. The agreement also requires credit-rating agencies to direct investment banks to provide them with more data on the pools of mortgages that make up the bonds.

The agencies have been under fire for the role they played in the subprime mortgage crisis by awarding top ratings to securities that soured. Regulators and investors have alleged that the agencies have a conflict of interest because they are paid by the investment banks issuing the securities, thus encouraging the credit agencies to give high ratings to win business.

The agreement seeks to end this practice by having the issuers pay the credit-rating agencies at four points during the rating process, not just at the end when the rating is given.

Credit-rating agencies will also be required to disclose information about all securities submitted for review, allowing investors to determine whether issuers sought, but subsequently decided not to use, ratings from a specific agency. This will allow investors to see whether investment banks shopped around for the agency that would give their securities the best rating, said Andrew M. Cuomo, New York's attorney general.

104.    As reported in *The Washington Post*, the NYAG further stated that:

The mortgage crisis currently facing this nation was caused in part by misrepresentations and misunderstanding of the true value of mortgage securities," Cuomo said in a statement. "By increasing the independence of the rating agencies, ensuring they get adequate information to make their ratings, and

increasing industry-wide transparency, these reforms will address one of the central causes of that collapse.

105.    Furthermore, in January 2009, the Congressional Oversight Panel ("COP") issued a Special Report on Regulatory Reform, Modernizing the American Financial Regulatory System:  Recommendations for Improving Oversight, Protecting Consumers and Ensuring Stability" (the "January 2009 COP Report").   The January 2009 COP Report stated, in no uncertain terms:

> **Problem with current [Credit Ratings] system:** *The credit rating system is ineffective and plagued with conflicts of interest.*
>
> *The major credit rating agencies played an important-and perhaps decisive-role in enabling (and validating) much of the behavior and decision making that now appears to have put the broader financial system at risk.* In the subprime-related market specifically, high ratings for structured financial products - especially mortgage-backed securities … - were essential for ensuring broad demand for these products.  High ratings not only instilled confidence in potentially risk-averse investors, but also helped satisfy investors' regulatory requirements, which were often explicitly linked to ratings from the major credit rating agencies. By 2006, Moody's business in rating structured financial products accounted for 44 percent of its revenues, as compared to 32 percent from its traditional corporate-bond rating business.  It has also been reported that "roughly 60 percent of all global structured products were AAA-rated, in contrast to less than 1 percent of corporate issues."  Financial firms, from Fannie Mae to AIG, also benefited greatly from having high credit ratings of their own-especially AAA-allowing them not only to borrow at low rates on the short-term markets to finance longer-term (and higher yielding) investments but also to sell guaranties of various sorts, effectively "renting out" their credit rating.

January 2009 COP Report, at 40-41.

106.    This stance is in stark contrast to the findings of the SEC in a Report issued in January 2003, titled Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets (defined herein as the "January 2003 SEC Report") which the commission released as required by Rule 702(b) of the Sarbanes-Oxley Act of 2002 in the wake of the Enron debacle.  The January 2003 SEC Report examined the presence and effects of any

***"potential" conflicts of interest*** that may exist and arise in the relationship between Ratings

Agencies and Issuers/Subscribers securities.   In contrast to the statements made in the January

2009 COP Report, the January 2003 SEC Report contained the following:[4]

> c.      *Concerns Regarding Credit Rating Agencies (e.g., Potential Conflicts of Interest or Abusive Practices)*
>
> i.      <u>Issuer Influence</u>.   ***In general, hearing participants [including executives of major Credit Rating Agencies] did not believe that reliance by rating agencies on issuer fees leads to significant conflicts of interest, or otherwise calls into question the overall objectivity of credit ratings.…***

January 2003 SEC Report, at 23. (Emphasis added).

107.   As a result, the conclusion set forth in the January 2003 SEC Report relating to

"Potential Conflicts of Interest" was:

> 1.      The Commission will explore whether NRSROs should implement procedures to manage potential conflicts of interest that arise when issuers pay for ratings.
>
> 2.      The Commission will explore whether NRSROs should prohibit (or severely restrict) direct contacts between rating analysts and subscribers.
>
> 3.      The Commission will explore whether NRSROs should implement procedures to manage potential conflicts of interest that arise when ratings agencies develop ancillary fee-based businesses.

January 2003 SEC Report, at 44.

108.   No supplemental report or decisive action had been issued or taken by the

Commission addressing these "potential conflicts" or providing investors with any additional

insight into the role of the Ratings Agency Defendants in the structuring of MBS and massive

incentives to provide AAA ratings to them, despite the passing of the Ratings Agency Act of

2006, Pub. Law No. 109-291, until after the collapse of the subprime markets.   However, on

---

[4]      The report was based on testimony gathered from executives of the top NRSROs, including Sean J. Egan, Stephen W. Joynt, and Raymond W. McDaniel, whose testimony, as set forth in detail herein, had changed dramatically by 2008.

April 21, 2005, in testimony before the Senate Committee on Banking, Housing and Urban

Affairs, Allen L. Beller, Director of the SEC's Division of Corporate Finance, stated, in part:

> [I]n late 2002, staff of the Commission, Department of Treasury and OFHEO conducted a joint study of disclosure regarding mortgage-backed securities with a view to ensure that investors in mortgage-backed securities are provided with the information that they should have.  The task force issued a report in January 2003. [Footnote omitted.]  ***The report notes that market participants found the mortgage-backed securities market extremely efficient…***

Testimony of Allen L. Beller before the Senate Committee on Banking, Housing and Urban Affairs, April 21, 2005. (Emphasis added.)

109.    Furthermore, the January 2009 COP Report set forth the effect of outdated models

and issuer conflicts of interest, stating:

> Regarding conflicts of interests, worrisome is the rating agencies' practice of charging issuers for their ratings, a practice that began at Fitch and Moody's in 1970 and at Standard & Poor's a few years later.  ***Although the practice of collecting payments from issuers has long provoked criticism, market observers often downplayed these concerns, suggesting that "the agencies have an overriding incentive to maintain a reputation for high-quality, accurate ratings."  Others, [such as Jeremy Fons], however, claim that the "issuer pays" model biases ratings upward and also encourages "ratings shopping" by issuers, which in turn provokes a race to the bottom on the part of the rating agencies, each willing to lower quality standards to drum up more business.***
>
> ***Beyond the ratings themselves, credit rating agencies also charge issuers for advice, including pre-rating assessments (in which issuers learn what ratings will likely be under various hypothetical scenarios) and risk-management consulting. In some cases, credit rating agency analysts subsequently go to work for the companies they had been rating.  This revolving-door practice creates not only the potential for conflicts of interest but also for gaming of the system, since former employees of the rating agencies presumably know how best to exploit weaknesses in the agencies' risk assessment models.***
>
> Many critics charge that it was the models themselves-and overreliance on them-that got the credit rating agencies into trouble in recent years, particularly in assigning ratings to structured financial products. ***"Instead of focusing on actual diligence of the risks involved, demanding additional issuer disclosures, or scrutinizing collateral appraisers' assessments…rating agencies primarily relied on mathematical models that estimated the loss distribution and simulated the cash flows of RMBS [residential mortgage backed securities] and CDOs using historical data.***

*Many of the models involved excessively rosy assumptions about the quality of the underlying mortgages, ignoring the fact that these mortgages (especially subprime mortgages) were far riskier than ever before and were in fact becoming steadily riskier year by year.  Credit rating agency modeling of mortgage-related securities may also have involved mistaken assumptions about the independence of the underlying mortgages-including the assumption that defaults would not be highly correlated across a broad bundle of mortgages or mortgage-related securities.  By extension, many of the rating agencies' models may also have involved overly optimistic assumptions about the direction of housing prices (that is, that they would not fall by much, if at all).*  When asked on a conference call in March 2007 about how a 1 to 2 percent decline in home prices over an extended period of time would affect Fitch's modeling of certain subprime-related securities, a Fitch representative conceded, "The models would break down completely."*

January 2009 COP Report, at 41-42. (Emphasis added.)

110.    As a result of the above disclosures and the Rating Agency "reassessment" of the collateral underlying the Offering, the value of the Certificates has substantially collapsed.

**The Registration Statement and Prospectus Supplement**
**Contained Material Misstatements and Omissions of Fact**

111.    The Registration Statement represented that all of the loans which made up the pool of residential, subprime mortgages used to support the Certificates were subject to certain underwriting guidelines, *i.e.,* the Guidelines, which assessed the borrower's creditworthiness, including multi-level reviews of loan applications.   Specifically, the Registration Statement contained Risk Factors setting forth potential risks associated with investments in the Certificates:

Risks Relating to Non-Conforming Underwriting Guidelines

The originator's underwriting standards are intended to assess the creditworthiness of the borrower and the value of the mortgaged property and to evaluate the adequacy of the related property as collateral for the loan. In comparison to first lien mortgage loans that conform to the underwriting guidelines of FNMA or FHLMC the loans have generally been underwritten or reunderwritten with more lenient underwriting criteria. For example, the loans may have been made to borrowers having imperfect credit histories, ranging from

minor delinquencies to bankruptcies, or borrowers with higher ratios of monthly mortgage payments to income or higher ratios of total monthly credit payments to income.

Accordingly, the loans will likely experience higher, and possibly substantially higher, rates of delinquencies, defaults and losses than the rates experienced by loans underwritten according to FNMA or FHLMC guidelines. As a result, the risk that you will suffer losses could increase. Furthermore, changes in the values of the mortgaged properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the loans than on mortgage loans originated according to FNMA or FHLMC guidelines. We cannot assure you that the values of the mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related loans. See "—Adequacy of Credit Enhancement" above, and "Underwriting Criteria" in this prospectus supplement.

MASTR Form S-3/A Registration Statement, filed April 4, 2006 at 88.

112.    The Registration Statement disclosed that the underlying loans were principally originated by the Originators.  The Registration Statement represented that all the underlying loans were subject to underwriting guidelines which were intended to assess borrower creditworthiness.  The underwriting standards set forth in the Registration Statement and Basic Prospectus were as follows:

[The loans were underwritten or reunderwritten in accordance with _____'s underwriting standards. These standards are designed to permit mortgage lending to borrowers whose creditworthiness and repayment ability do not satisfy the more stringent underwriting requirements used as standards for FNMA and FHLMC._____has established risk categories by which it aggregates acceptable loans into groupings considered to have progressively greater risk characteristics. The discussion under this section sets forth a more detailed description of those risk categories applicable to the loans. _____'s underwriting of the loans generally consisted of analyzing the following as standards applicable to the loans:

-    the creditworthiness of a borrower;

-    the income sufficiency of a borrower's projected family income relative to the mortgage payment and to other fixed obligations, including in some instances rental income from investment property; and

- the adequacy of the mortgaged property, expressed in terms of Loan-to-Value Ratio, to serve as the collateral for a mortgage loan.

The transferor has implemented a credit policy that provides a number of guidelines to assist underwriters in the credit decision process. The creditworthiness characteristics emphasized by the transferor are the borrower's debt-to-income ratio, credit history and employment stability. The debt-to-income ratio for a borrower is calculated by dividing:

(1)  the borrower's total monthly payment obligations, including payments due under the loan with the transferor, but after any debt consolidation from the proceeds of that loan, by

(2)  the borrower's monthly gross income.

A credit bureau report that reflects the applicant's credit history is obtained by the transferor from an independent, nationally recognized credit-reporting agency. The credit report typically contains information reflecting delinquencies, repossessions, judgments, foreclosures, bankruptcies and similar instances of adverse credit that can be discovered by a search of public records. A loan applicant's credit report must be current – generally less than 90 days old – at the time of application. The credit report is used to evaluate the borrower's payment record and tendency to repay debts in a timely manner. A lack of credit payment history will not necessarily preclude a loan if other favorable borrower characteristics exist, including sufficient equity in the property or an adequate debt-to-income ratio.

The calculation of the borrower's debt-to-income ratio involves a careful review of all debts listed on the credit report and the loan application, as well as the verification of gross income. A borrower's income is verified through various means, including

(1)  applicant interviews,

(2)  written verifications with employers, and

(3)  the review of pay stubs, bank statements, tax returns, W-2's or other acceptable forms of documentation.

The debt-to-income ratio is calculated to determine if a borrower demonstrates sufficient income levels to cover or satisfy all debt repayment requirements.

Generally, each borrower would have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower. As part of the description of the borrower's financial condition, each borrower furnished

-     information, which may have been supplied solely in that application, with respect to its assets, liabilities, income, credit history, employment history and personal information, and

-     an authorization to apply for a credit report which summarized the borrower's credit history with local merchants and lenders and any record of past or present bankruptcy or foreclosure proceedings.

The borrower may have also been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts. In the case of investment properties, income derived from the mortgaged property may have been considered for underwriting purposes. With respect to mortgaged property consisting of vacation or second homes, generally no income derived from the property was considered for underwriting purposes, but could be considered as a compensating factor.

A determination was made by _____ that the borrower's monthly income would be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property. This determination was made based on the data provided in the application, some verifications and the appraisal or other valuation of the mortgaged property. In some circumstances, _____ may also have considered the amount of liquid assets available to the borrower after origination.

Prospective borrowers may submit loan applications under one of three programs. These programs differ from each other with respect to the requirements for the verification of the income of the borrower and the source of funds required to be deposited by the applicant in order to close the loan. Some of the loans have been originated under "Easy Documentation" programs that require less documentation and verification than do traditional "Full Documentation" programs. Generally, under this type of program, minimal investigation into a borrower's income profile would have been undertaken by the originator. The underwriting for those mortgage loans will place a greater emphasis on the value of the mortgaged property and credit history. Under the "Easy Documentation" program, applicants must have income evidenced by six months of personal bank statements. Under the "Full Documentation" program, borrowers are generally required to submit documentation verifying at least two years of income and employment history. Under the "Stated Income Application" program, no verification of the applicant's income is required. Rather, the applicant may be qualified based on monthly income as stated in the mortgage loan application, if that income is supported by the general information included in the loan application package.

As used in this discussion of the underwriting standards, "Loan-to-Value Ratio" generally means that ratio, expressed as a percentage of,

    (1)    the principal amount of the loan at origination, over

      (2)    the lesser of the sales price or the appraised value of the related mortgaged property at origination, or in the case of a refinanced or modified loan, either the appraised valued determined at origination or, if applicable, at the time of the refinancing or modification.

The adequacy of a mortgaged property as security for repayment of the related mortgage loan generally has been determined by an appraisal in accordance with preestablished appraisal procedure guidelines for appraisals established by _____. Appraisers were typically licensed independent appraisers selected in accordance with the underwriting standards. The appraisal procedure guidelines generally required the appraiser or an agent on its behalf to inspect the property personally and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal would have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property.  The Loan-to-Value Ratio has been supported by a review appraisal conducted by _____ or an independent review company.

Pursuant to the underwriting standards, each loan was assigned a risk grade and categorized in a "Loan Class," denominated by a letter. _____'s risk classification system is designed to assess the likelihood that each borrower will satisfy the repayment obligations associated with the related mortgage loan and to establish the maximum permissible Loan-to-Value Ratio for the mortgage loan. Time frames referred to below, e.g., "within the last 12 months," are measured from the time of underwriting of a borrower's credit.

[Loan Class A: For a loan to have been assigned to a Loan Class A, the prospective borrower must have overall "good" to "excellent" consumer credit. No 30-day, 60-day or 90-day late payments within the last 12 months are acceptable on an existing mortgage loan. Any existing mortgage loan must be current at the time of the application and no notices of default within the last three years on an existing mortgage loan are permitted. Minor derogatory items are allowed as to non-mortgage credit. However, open collections and charge-offs in excess of $500 must be paid down to zero at closing unless they are three years old or older and not reflected in the title report or are medical related. No Chapter 7 bankruptcies with respect to the borrower may have been discharged during the previous three years. No Chapter 13 bankruptcy filings may have been made by the borrower during the previous three years. No foreclosures may have been filed within the last three years with respect to borrower property. No foreclosure sales with respect to borrower property may have been conducted within the last three years. The mortgaged property must be in average to good condition. A maximum Loan-to-Value Ratio of 90% is permitted for a mortgage loan secured by a single family owner-occupied property, or 80% for a mortgage loan originated under an

"Easy Documentation" program and 80% for a mortgage loan originated under a "Stated Income" application program. A maximum Loan-to-Value Ratio of 80% is permitted for a mortgage loan secured by a non-owner occupied property. The maximum permissible Loan-to-Value Ratio is lower for mortgage loans with initial principal amounts in excess of $300,000 secured by owner-occupied properties, or lower dollar amounts for loans secured by non-owner-occupied properties, and for mortgage loans made in connection with a borrower refinancing in which the borrower borrows more than is needed to refinance his old mortgage loan. The borrower's debt service-to-income ratio generally is 45% or less.

Loan Class A-: For a loan to have been assigned to Loan Class A-, the prospective borrower is required to have overall "good" to "excellent" consumer credit. A maximum of two 30-day late payments, and no 60-day or 90-day late payments within the last 12 months is acceptable on an existing mortgage loan. Any existing mortgage loan must be current at the time of the application and no notices of default within the last three years on an existing mortgage loan are permitted. As to non-mortgage credit, some prior defaults may have occurred. However, open collections and charge-offs in excess of $500 must be paid down to zero at closing unless they are three years old or older and not reflected in the title report or are medical related. No Chapter 7 bankruptcies with respect to the borrower may have been discharged during the two years. No Chapter 13 bankruptcy filings may have been made by the borrower during the previous two years. No foreclosures may have been filed within the last three years with respect to borrower property. No foreclosure sales with respect to the borrower property may have been conducted within the last two years. The mortgaged property must be in average to good condition. A maximum Loan-to-Value Ratio of 90% is permitted for a mortgage loan secured by an owner-occupied property. A maximum Loan-to-Value Ratio of 80% or 75% for mortgage loans originated under an "Easy Documentation" program and 65% for mortgage loans originated under a Stated Income Application program, is permitted for a mortgage loan secured by non-owner-occupied property. The maximum permissible Loan-to-Value Ratio is lower for mortgage loans with initial principal amounts in excess of $300,000 secured by owner-occupied properties, or lower dollar amounts for loans secured by non-owner-occupied properties. The maximum permissible Loan-to-Value Ratio is also lower for mortgage loans made in connection with a borrower refinancing in which the borrower borrows more than is needed to refinance his old mortgage loan. The debt service-to-income ratio generally is 50% or less.

Loan Class B: For a loan to have been assigned to Loan Class B, the prospective borrower may not have paid all previous or existing installment or revolving debt according to its terms and may have some charge-offs, and is required to have overall "satisfactory" consumer credit. A maximum of four 30-day late payments, or two 30-day late payments and one 60-day late payment, but no 90-day late payments, within the last 12 months is acceptable on an existing mortgage loan and no notices of default within the last two years on an existing mortgage loan

are permitted. As to non-mortgage credit, some prior defaults may have occurred. However, open collections and chargeoffs must be paid down to an amount not in excess of $500 at closing unless they are three years old or older and not reflected in the title report or are medical related. No Chapter 7 bankruptcies with respect to the borrower may have been discharged during the previous two years. No Chapter 13 bankruptcy filings may have been made by the borrower during the previous two years. No foreclosures may have been filed within the last two years with respect to borrower property. A maximum Loan-to-Value Ratio of 85% is permitted for a mortgage loan secured by an owner-occupied property. A maximum Loan-to-Value Ratio of 75% is permitted for a mortgage loan secured by a non-owner-occupied property. The maximum permissible Loan-to-Value Ratio is lower for mortgage loans with initial principal amounts in excess of $300,000 secured by owner-occupied properties, or lower dollar amounts for loans secured by non-owner-occupied properties. The maximum permissible Loan-to-Value Ratio is also lower for mortgage loans made in connection with a borrower refinancing in which the borrower borrows more than is needed to refinance his old mortgage loan. The debt service-to-income ratio generally is 50% or less.

Loan Class C: For a loan to have been assigned to Loan Class C, the prospective borrower may have experienced significant credit problems in the past, with overall "fair" consumer credit and a majority of credit not currently delinquent. As to mortgage credit, the borrower may have had a history of being generally 30 days delinquent, and a maximum of two 60-day late payments and one 90-day late payment within the last 12 months is acceptable on an existing mortgage loan. No notices of default within the last twelve months, or eighteen months if the Loan-to-Value Ratio is 75% or higher, or on an existing mortgage loan are permitted. As to non-mortgage credit, significant prior defaults may have occurred. However, open collections and charge-offs must be paid down to an amount not in excess of $1,500 at closing unless they are three years old or older and not reflected in the title report or are medical related. No bankruptcies may have been filed or discharged during the 12-month period prior to the date the mortgage loan was made. No foreclosures may have been filed within the last year with respect to borrower property. The mortgaged property must be in average to good condition. A maximum Loan-to-Value Ratio of 80% is permitted for a mortgage loan secured by an owner-occupied property. A maximum Loan-to-Value Ratio of 70% is permitted for a mortgage loan secured by a non-owner-occupied property. The maximum permissible Loan-to-Value Ratio is lower for mortgage loans with initial principal amounts in excess of $300,000 secured by owner-occupied properties, or lower dollar amounts for loans secured by non-owner occupied properties. The maximum permissible Loan-to-Value Ratio is also lower for mortgage loans made in connection with a borrower refinancing in which the borrower borrows more than is needed to refinance his old mortgage loan. The debt service-to-income ratio generally is 55% or less.

Loan Class C-: For a loan to have been assigned to Loan Class C-, the prospective borrower may have experienced significant credit problems in the past, with overall "poor" consumer credit. As to mortgage credit, the borrower may have had a history of being generally 30 days delinquent, is not more than 120-days delinquent on an existing mortgage loan and there may not be a current notice of default outstanding on an existing mortgage loan. As to non-mortgage credit, significant prior defaults may have occurred. However, open collections and charge-offs must be paid down to an amount not in excess of $1,500 at closing unless they are three years old or older and not reflected in the title report or are medical related. The mortgaged property must be in average to good condition. A maximum Loan-to-Value Ratio of 70% is permitted for a mortgage loan secured by an owner-occupied property. A maximum Loan-to-Value Ratio of 65% for all programs is permitted for a mortgage loan secured by a non- owner-occupied property. The maximum permissible Loan-to-Value Ratio is lower for mortgage loans with initial principal amounts in excess of $300,000 secured by owner-occupied properties, or lower dollar amounts for loans secured by non-owner occupied properties. The maximum permissible Loan-to-Value Ratio is also lower for mortgage loans made in connection with a borrower refinancing in which the borrower borrows more than is needed to refinance his old mortgage loan. The debt service-to-income ratio generally is 55% or less.

Loan Class D: For a loan to have been assigned to Loan Class D, the prospective borrower will have experienced substantial credit problems in the past, and generally will have overall poor credit. The prospective borrower's credit history is poor and a notice of default on an existing mortgage loan may have been filed against the borrower. As to non-mortgage credit, significant prior defaults may have occurred. However, open collections and charge-offs must be paid down to an amount not in excess of $2,500 at closing unless they are three years old or older and not reflected in the title report or are medical related. A bankruptcy filing by the borrower is permitted if it is discharged at closing. Also, on a case-by-case basis, _____ may make a loan on a mortgage that takes a borrower out of foreclosure. _____ will make a mortgage loan to a borrower to take him out of bankruptcy or foreclosure only if it improves the borrower's financial situation. The mortgaged property must be in average to good condition. A maximum Loan-to-Value Ratio of 65% is permitted for mortgage loans originated under a full documentation program, "Easy Documentation" program or "Stated Income" application program. A maximum Loan-to-Value Ratio of 60% for mortgage loans originated under a full documentation program, "Easy Documentation" program or "Stated Income" application program is permitted for a mortgage loan secured by a non-owner-occupied property. The maximum permissible Loan-to-Value Ratio is lower for mortgage loans with initial principal amounts in excess of $300,000 secured by owner-occupied properties, or lower dollar amounts for loans secured by non-owner-occupied properties. The maximum permissible Loan-to-Value Ratio is also lower for mortgage loans made in connection with a borrower refinancing in which the borrower borrows more

than is needed to refinance his old mortgage loan. The debt service-to-income ratio generally is 65% or less.

As described in this section the indicated underwriting standards applicable to the loans include the foregoing categories and characteristics as guidelines only. On a case-by-case basis, _____ may have determined in the course of its underwriting process that a prospective borrower warrants a Loan-to-Value Ratio upgrade based on compensating factors. For example, a borrower may be able to get a loan in a particular Loan Class with a Loan-to-Value Ratio __% higher than the ratio that would otherwise be permitted for that Loan Class if particular compensating factors exist.

Based on the indicated underwriting standards applicable for mortgage loans with risk features originated under these standards, and in particular loans in Loan Classes C- and D as described in this prospectus supplement,] these loans are likely to experience greater rates of delinquency, foreclosure and loss. As a result, these loans may experience substantially greater rates of delinquency, foreclosure and loss, than mortgage loans underwritten under more stringent underwriting standards.

MASTR Form S-3/A Registration Statement, filed April 4, 2006 at 110.

113.    The statements in the preceding paragraphs contained misstatements and material omissions including in connection with the underwriting standards pursuant to which the underlying mortgage collateral was originated.  As set forth herein, Originators of the underlying collateral routinely ignored the stated mortgage loan underwriting guidelines in order to increase production and profits derived from their mortgage lending businesses.  Furthermore, the Defendants herein failed to conduct adequate, or in many cases any, due diligence on the mortgage loan applications and mortgaged properties prior to or during the securitization process.

114.    In addition to the Registration Statement, the Prospectus Supplement, which incorporates the language of the Registration Statement, set forth the stated mortgage loan underwriting guidelines that the mortgage loans underlying the Offering were originated pursuant to.  Initially, with respect to the general underwriting guidelines purportedly adhered to

in the underwriting of the mortgage loans, the Prospectus Supplement for the MASTR Series

2007-3 Certificate Offering, filed on May 17, 2007, stated:

> The Loans have been purchased by the sponsor from an Originator which purchased the Loans from various banks, savings and loan associations, mortgage bankers (which may or may not be affiliated with that Originator) and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section "—General," or the following sections pertaining to Countrywide Home Loans and IndyMac Bank, F.S.B. and their related Loans.

> A majority of the Loans (other than the Subgroup 1-1 Loans and Subgroup 2-1 Loans) are "conventional non-conforming mortgage loans" (i.e., loans which are not insured by the Federal Housing Authority or partially guaranteed by the Department of Veteran Affairs or which do not qualify for sale to Fannie Mae or Freddie Mac and are negative amortization loans secured by first liens on one- to four-family residential properties).

> The underwriting standards applicable to the Loans (other than the Subgroup 1-1 Loans and 2-1 Loans) typically differ from, and are, with respect to a substantial number of such Loans, generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac primarily with respect to original principal balances, loan-to-value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types. To the extent the programs reflect underwriting standards different from those of Fannie Mae and Freddie Mac, the performance of the Loans thereunder may reflect higher delinquency rates and/or credit losses. In addition, certain exceptions to the underwriting standards described in this prospectus supplement are made in the event that compensating factors are demonstrated by a prospective borrower.

> ***Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower. As part of the description of the borrower's financial condition, the borrower will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts. In the case of investment properties and two to four unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the borrower from other sources. With respect to mortgaged properties consisting of vacation or second homes, no income***

*derived from the property generally will have been considered for underwriting purposes. In the case of certain borrowers with acceptable payment histories, no income will be required to be stated (or verified) in connection with the loan application.*

Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. Generally, scheduled payments on a Loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage of the prospective borrower's gross income. The percentage applied varies on a case by case basis depending on a number of underwriting criteria, including the loan-to-value ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the borrower after origination.

*Certain of the Loans have been originated under alternative documentation, streamlined documentation, reduced documentation, "lite" documentation, stated income, low/limited or "Express" documentation, no stated income, no ratio, "NIV" or no documentation programs, which require less documentation and verification than do traditional full documentation programs. Generally, under an alternative documentation program, the borrower provides alternate forms of documentation to verify employment, income and assets. Under a streamlined documentation program, a borrower's income and assets that have been previously documented are re verified, and any additional documentation and verification is limited. Under a reduced documentation program, verification of either a borrower's stated income or stated assets, but not both, is undertaken by the originator. Under a "lite" documentation, "stated income" or "NIV" program, a borrower is required to state both their income and assets, but the originator only undertakes to verify such borrower's assets. Under low/limited or "Express" documentation program, the amount of documentation required to document a borrower's income and assets is limited. Under a no stated income program or a no ratio program, certain borrowers with acceptable payment histories will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken. Under a no documentation program, the borrower is not required to state either their income or assets, and accordingly no verification of such borrower's income or assets is undertaken by the originator. The underwriting for such Loans may be based primarily or entirely on other factors, such as an appraisal of the mortgaged property, the loan-to-value ratio at origination and the borrower's credit score and previous mortgage payment history.*

> *The adequacy of the mortgaged property as security for repayment of the related Loan will generally have been determined by an appraisal in accordance with pre established appraisal procedure standards for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre established appraisal procedure standards established by the originator. The appraisal procedure standards generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on the current cost of constructing or purchasing a similar property.*

MASTR Series 2007-3 Prospectus Supplement Form 424B5, May 17, 2007 at S-50 (emphasis added).

     115.    Furthermore, the Prospectus Supplement set forth detailed underwriting standards employed by CHL in originating the underlying collateral, stating in large part:

> …Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations.

> As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income. If required by its underwriting guidelines, Countrywide Home Loans obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for the most recent two years, relevant portions of the most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization. Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

> In assessing a prospective borrower's creditworthiness, Countrywide Home Loans may use FICO Credit Scores. "FICO Credit Scores" are statistical credit scores designed to assess a borrower's creditworthiness and likelihood to default on a consumer obligation over a two-year period based on a borrower's credit history. FICO Credit Scores were not developed to predict the likelihood of default on mortgage loans and, accordingly, may not be indicative of the ability of a borrower to repay its mortgage loan. FICO Credit Scores range from

approximately 250 to approximately 900, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score. Under Countrywide Home Loans' underwriting guidelines, borrowers possessing higher FICO Credit Scores, which indicate a more favorable credit history and who give Countrywide Home Loans the right to obtain the tax returns they filed for the preceding two years, may be eligible for Countrywide Home Loans' processing program (the "Preferred Processing Program").

Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for mortgage loans originated through a loan correspondent or mortgage broker. In those instances, the initial determination as to whether a mortgage loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker. In addition, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself.

Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. If the prospective borrower has applied for an interest-only Six-Month LIBOR Loan, the interest component of the monthly mortgage expense is calculated based upon the initial interest rate plus 2%. If the prospective borrower has applied for a 3/1 Mortgage Loan or 3/27 Mortgage Loan and the Loan-to-Value Ratio is less than or equal to 75%, the interest component of the monthly mortgage expense is calculated based on the initial loan interest rate; if the Loan-to-Value Ratio exceeds 75%, the interest component of the monthly mortgage expense calculation is based on the initial loan interest rate plus 2%. If the prospective borrower has applied for a 5/1 Mortgage Loan, a 5/25 Mortgage

Loan, a 7/1 Mortgage Loan, a 7/23 Mortgage Loan, a 10/1 Mortgage Loan or a 10/20 Mortgage Loan, the interest component of the monthly mortgage expense is calculated based on the initial loan interest rate. If the prospective borrower has applied for a Negative Amortization Loan, the interest component of the monthly housing expense calculation is based upon the greater of 4.25% and the fully indexed mortgage note rate at the time of loan application. If the prospective borrower has applied for a Hybrid Negative Amortization Loan, the monthly housing expense calculation is based upon an interest only payment at the initial note rate. The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. ***Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower. Additionally, Countrywide Home Loans does permit its adjustable rate mortgage loans, hybrid adjustable rate mortgage loans and negative amortization mortgage loans to be assumed by a purchaser of the related mortgaged property, so long as the mortgage loan is in its adjustable rate period (except for a 3/1 Mortgage Loan, which may be assumed during the fixed rate period) and the related purchaser meets Countrywide Home Loans' underwriting standards that are then in effect.***

Countrywide Home Loans may provide secondary financing to a borrower contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%. Countrywide Home Loans' underwriting guidelines do not prohibit or otherwise restrict a borrower from obtaining secondary financing from lenders other than Countrywide Home Loans, whether at origination of the mortgage loan or thereafter.

The nature of the information that a borrower is required to disclose and whether the information is verified depends, in part, on the documentation program used in the origination process. In general under the Full Documentation Loan Program (the "Full Documentation Program"), each prospective borrower is required to complete an application which includes information with respect to the applicant's assets, liabilities, income, credit history, employment history and other personal information. Self-employed individuals are generally required to submit their two most recent federal income tax returns. Under the Full Documentation Program, the underwriter verifies the information contained in the application relating to employment, income, assets and mortgages.

A prospective borrower may be eligible for a loan approval process that limits or eliminates Countrywide Home Loans' standard disclosure or verification requirements or both. Countrywide Home Loans offers the following

documentation programs as alternatives to its Full Documentation Program: an Alternative Documentation Loan Program (the "Alternative Documentation Program"), a Reduced Documentation Loan Program (the "Reduced Documentation Program"), a CLUES Plus Documentation Loan Program (the "CLUES Plus Documentation Program"), a No Income/No Asset Documentation Loan Program (the "No Income/No Asset Documentation Program"), a Stated Income/Stated Asset Documentation Loan Program (the "Stated Income/Stated Asset Documentation Program") and a Streamlined Documentation Loan Program (the "Streamlined Documentation Program"). For all mortgage loans originated or acquired by Countrywide Home Loans, Countrywide Home Loans obtains a credit report relating to the applicant from a credit reporting company. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, dispossession, suits or judgments. All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.

Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

Countrywide Home Loans requires title insurance on all of its mortgage loans secured by first liens on real property. Countrywide Home Loans also requires that fire and extended coverage casualty insurance be maintained on the mortgaged property in an amount at least equal to the principal balance of the related single-family mortgage loan or the replacement cost of the mortgaged property, whichever is less.

In addition to Countrywide Home Loans' standard underwriting guidelines (the "Standard Underwriting Guidelines"), which are consistent in many respects with the guidelines applied to mortgage loans purchased by Fannie Mae and Freddie Mac, Countrywide Home Loans uses underwriting guidelines featuring expanded criteria (the "Expanded Underwriting Guidelines"). The Standard Underwriting Guidelines and the Expanded Underwriting Guidelines are described further under the next two headings.

*Standard Underwriting Guidelines*

Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 75% for mortgage loans with original principal balances of up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000.

*  *  *

In connection with the Standard Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Program, the CLUES Plus Documentation Program or the Streamlined Documentation Program.

***The Alternative Documentation Program permits a borrower to provide W-2 forms instead of tax returns covering the most recent two years, permits bank statements in lieu of verification of deposits and permits alternative methods of employment verification.***

***Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived. Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment. Since information relating to a prospective borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio ranges up to 95%.***

***The CLUES Plus Documentation Program permits the verification of employment by alternative means, if necessary, including verbal verification of employment or reviewing paycheck stubs covering the pay period immediately prior to the date of the mortgage loan application. To verify the borrower's assets and the sufficiency of the borrower's funds for closing, Countrywide Home Loans obtains deposit or bank account statements from each prospective borrower for the month immediately prior to the date of the mortgage loan application. Under the CLUES Plus Documentation Program, the maximum Loan-to-Value Ratio is 75% and property values may be based on appraisals comprising only interior and exterior inspections. Cash-out refinances and investor properties are not permitted under the CLUES Plus Documentation Program.***

60

*The Streamlined Documentation Program is available for borrowers who are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. Under the Streamlined Documentation Program, appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of 80% or if the loan amount of the new loan being originated is greater than $650,000. In addition, under the Streamlined Documentation Program, a credit report is obtained but only a limited credit review is conducted, no income or asset verification is required, and telephonic verification of employment is permitted. The maximum Loan-to-Value Ratio under the Streamlined Documentation Program ranges up to 95%.*

*Expanded Underwriting Guidelines*

Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements than those associated with the Standard Underwriting Guidelines. The Expanded Underwriting Guidelines also permit higher debt-to-income ratios than mortgage loans underwritten pursuant to the Standard Underwriting Guidelines.

Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000 and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000.

\*        \*        \*

*Under its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively.*

*In connection with the Expanded Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Loan Program, the No Income/No Asset Documentation Program and the Stated Income/Stated Asset Documentation Program. Neither the No Income/No Asset Documentation Program nor the Stated Income/Stated Asset Documentation Program is available under the Standard Underwriting Guidelines.*

*The same documentation and verification requirements apply to mortgage loans documented under the Alternative Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Alternative Documentation Program, mortgage loans that have been underwritten pursuant to the Expanded Underwriting Guidelines may have higher loan balances and Loan-to-Value Ratios than those permitted under the Standard Underwriting Guidelines.*

*Similarly, the same documentation and verification requirements apply to mortgage loans documented under the Reduced Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Reduced Documentation Program, higher loan balances and Loan-to-Value Ratios are permitted for mortgage loans underwritten pursuant to the Expanded Underwriting Guidelines than those permitted under the Standard Underwriting Guidelines. The maximum Loan-to-Value Ratio, including secondary financing, ranges up to 90%. The borrower is not required to disclose any income information for some mortgage loans originated under the Reduced Documentation Program, and accordingly debt-to-income ratios are not calculated or included in the underwriting analysis. The maximum Loan-to-Value Ratio, including secondary financing, for those mortgage loans ranges up to 85%.*

*Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan file, they are not taken into account for purposes of the underwriting analysis. This program is limited to borrowers with excellent credit histories. Under the No Income/No Asset Documentation Program, the maximum Loan-to-Value Ratio, including secondary financing, ranges up to 95%. Mortgage loans originated under the No Income/No Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.*

*Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable*

*for the borrower's employment and that the stated assets are consistent with the borrower's income. The Stated Income/Stated Asset Documentation Program permits maximum Loan-to-Value Ratios up to 90%. Mortgage loans originated under the Stated Income/Stated Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.*

*Under the Expanded Underwriting Guidelines, Countrywide Home Loans may also provide mortgage loans to borrowers who are not U.S. citizens, including permanent and non-permanent residents. The borrower is required to have a valid U.S. social security number or a certificate of foreign status (IRS form W 8). The borrower's income and assets must be verified under the Full Documentation Program or the Alternative Documentation Program. The maximum Loan-to Value Ratio, including secondary financing, is 80%.*

MASTR Series 2007-3 Prospectus Supplement Form 424B5, May 17, 2007 at S-51 (emphasis added).

116. In addition, the Prospectus Supplement set forth detailed underwriting standards employed by IndyMac in originating the underlying collateral, stating in large part:

*Mortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac Bank according to IndyMac Bank's underwriting guidelines, which also accept mortgage loans meeting Fannie Mae or Freddie Mac guidelines regardless of whether such mortgage loans would otherwise meet IndyMac Bank's guidelines, or pursuant to an exception to those guidelines based on IndyMac Bank's procedures for approving such exceptions. Conventional mortgage loans are loans that are not insured by the FHA or partially guaranteed by the VA. Conforming mortgage loans are loans that qualify for sale to Fannie Mae and Freddie Mac, whereas non-conforming mortgage loans are loans that do not so qualify. Non-conforming mortgage loans originated or purchased by IndyMac Bank pursuant to its underwriting programs typically differ from conforming loans primarily with respect to loan-to-value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types.  To the extent that these programs reflect underwriting standards different from those of Fannie Mae and Freddie Mac, the performance of loans made pursuant to these different underwriting standards may reflect higher delinquency rates and/or credit losses.*

IndyMac Bank has two principal underwriting methods designed to be responsive to the needs of its mortgage loan customers: traditional underwriting and e-MITS (Electronic Mortgage Information and Transaction System) underwriting. E-MITS is an automated, internet-based underwriting and risk-based pricing system. IndyMac Bank believes that e-MITS generally enables it to estimate expected credit loss, interest rate risk and prepayment risk more objectively than traditional

63

underwriting and also provides consistent underwriting decisions. IndyMac Bank has procedures to override an e-MITS decision to allow for compensating factors.

***IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral. Traditional underwriting decisions are made by individuals authorized to consider compensating factors that would allow mortgage loans not otherwise meeting IndyMac Bank's guidelines.***

In determining a borrower's FICO credit score, IndyMac Bank generally selects the middle credit score of the scores provided by each of the three major U.S. credit repositories (Equifax, TransUnion and Experian) for each borrower, and then selects the lowest of these scores. In some instances, IndyMac Bank selects the middle score of the borrower with the largest amount of qualifying income among all of the borrowers on the mortgage loan. A FICO credit score might not be available for a borrower due to insufficient credit information on file with the credit repositories. In these situations, IndyMac Bank will establish a borrower's credit history through documentation of alternative sources of credit such as utility payments, auto insurance payments and rent payments. In addition to the FICO credit score, other information regarding a borrower's credit quality is considered in the loan approval process, such as the number and degree of any late mortgage or rent payments within the preceding 12-month period, the age of any foreclosure action against any property owned by the borrower, the age of any bankruptcy action, the number of seasoned tradelines reflected on the credit report and any outstanding judgments, liens, charge-offs or collections.

For each mortgage loan with a Loan-to-Value Ratio at origination exceeding 80%, IndyMac Bank will usually require a primary mortgage guarantee insurance policy that conforms to the guidelines of Fannie Mae and Freddie Mac. After the date on which the Loan-to-Value Ratio of a mortgage loan is 80% or less, either because of principal payments on the mortgage loan or because of a new appraisal of the mortgaged property, no primary mortgage guaranty insurance policy will be required on that mortgage loan.

***All of the insurers that have issued primary mortgage guaranty insurance policies with respect to the mortgage loans meet Fannie Mae's or Freddie Mac's standards or are acceptable to the Rating Agencies. In some circumstances, however, IndyMac Bank does not require primary mortgage guaranty insurance on mortgage loans with Loan-to-Value Ratios greater than 80%.***

IndyMac Bank originates and purchases loans that have been originated under one of seven documentation programs: Full/Alternate, FastForward, Bank Statement, Stated Income, No Income/No Asset, No Ratio and No Doc.

Under the Full/Alternate Documentation Program, the prospective borrower's employment, income and assets are verified through written or telephonic communications. All loans may be submitted under the Full/Alternate Documentation Program. The Full/Alternate Documentation Program also provides for alternative methods of employment verification generally using W-2 forms or pay stubs. Borrowers applying under the Full/Alternate Documentation Program may, based on certain credit and loan characteristics, qualify for IndyMac Bank's FastForward program and be entitled to income and asset documentation relief. Borrowers who qualify for FastForward must state their income, provide a signed Internal Revenue Service Form 4506 (authorizing IndyMac Bank to obtain copies of their tax returns), and state their assets; IndyMac Bank does not require any verification of income or assets under this program.

The Bank Statement Documentation Program is similar to the Full/Alternate Documentation Program except that borrowers generally must document income and employment for six months (rather than two, as required by the Full/Alternate Documentation Program). Borrowers under the Bank Statement Documentation Program may use bank statements to verify their income and employment. If applicable, written verification of a borrower's assets is required under this program.

Under the Stated Income Documentation Program and the No Ratio Program, more emphasis is placed on the prospective borrower's credit score and on the value and adequacy of the mortgaged property as collateral and other assets of the prospective borrower than on income underwriting. The Stated Income Documentation Program requires prospective borrowers to provide information regarding their assets and income. Information regarding assets is verified through written communications. Information regarding income is not verified. The No Ratio Program requires prospective borrowers to provide information regarding their assets, which is then verified through written communications. The No Ratio Program does not require prospective borrowers to provide information regarding their income. Employment is orally verified under both programs.

Under the No Income/No Asset Documentation Program and the No Doc Documentation Program, emphasis is placed on the credit score of the prospective borrower and on the value and adequacy of the mortgaged property as collateral, rather than on the income and the assets of the prospective borrower. Prospective borrowers are not required to provide information regarding their assets or income under either program, although under the No Income/No Asset Documentation Program, employment is orally verified.

IndyMac Bank generally will re-verify income, assets, and employment for mortgage loans it acquires through the wholesale channel, but not for mortgage loans acquired through other channels.

Maximum loan-to-value and combined loan-to-value ratios and loan amounts are established according to the occupancy type, loan purpose, property type, FICO credit score, number of previous late mortgage payments, and the age of any bankruptcy or foreclosure actions. Additionally, maximum total monthly debt payments-to-income ratios and cash-out limits may be applied. Other factors may be considered in determining loan eligibility such as a borrower's residency and immigration status, whether a non-occupying borrower will be included for qualification purposes, sales or financing concessions included in any purchase contract, the acquisition cost of the property in the case of a refinance transaction, the number of properties owned by the borrower, the type and amount of any subordinate mortgage, the amount of any increase in the borrower's monthly mortgage payment compared to previous mortgage or rent payments and the amount of disposable monthly income after payment of all monthly expenses.

***To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession Appraisal Practice. The appraiser generally inspects the property, analyzes data including the sales prices of comparable properties and issues an opinion of value using a Fannie Mae/Freddie Mac appraisal report form, or other acceptable form. In some cases, an automated valuation model (AVM) may be used in lieu of an appraisal. AVMs are computer programs that use real estate information, such as demographics, property characteristics, sales prices, and price trends to calculate a value for the specific property. The value of the property, as indicated by the appraisal or AVM, must support the loan amount.***

\*      \*      \*

***Exceptions to underwriting standards are permitted in situations in which compensating factors exist. Examples of these factors are significant financial reserves, a low loan-to-value ratio, significant decrease in the borrower's monthly payment and long-term employment with the same employer.***

MASTR Series 2007-3 Prospectus Supplement Form 424B5, May 17, 2007 at S-55 (emphasis added).

117.    The statements in the preceding paragraphs contained misstatements and material omissions including in connection with the underwriting standards pursuant to which the underlying mortgage collateral was originated.  As set forth herein, Originators of the underlying collateral routinely ignored the stated mortgage loan underwriting guidelines in order to increase production and profits derived from their mortgage lending businesses.  Furthermore, the

Defendants herein failed to conduct adequate, or in many cases any, due diligence on the mortgage loan applications and mortgaged properties prior to or during the securitization process.

**The Prospectus Supplement Misstated the Certificates' True Investment Rating**

118.    The Certificates were rated by the Rating Agency Defendants, which purported to take into account, *inter alia*, the stated mortgage loan underwriting guidelines applied by the Originators in originating the underlying mortgages to address the likelihood of the receipt of all distributions on the mortgage loans by the Certificateholders:

> A securities rating addresses the likelihood of the receipt by a certificateholder of distributions on the Loans. The rating takes into consideration the characteristics of the Loans and the structural, legal and tax aspects associated with the certificates. The ratings on the offered certificates do not, however, constitute statements regarding the likelihood or frequency of prepayments on the Loans, the payment of any Net Rate Carryovers or the possibility that a holder of an offered certificate might realize a lower than anticipated yield.…

> *       *       *

> A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization. Each security rating should be evaluated independently of any other security rating. In the event that the ratings initially assigned to any of the offered certificates by the rating agencies are subsequently lowered for any reason, no person or entity is obligated to provide any additional support or credit enhancement with respect to such offered certificates.

> The rating agencies have stated that it is their standard policy to monitor ratings on publicly offered securities for which a rating has been provided, as to each rating agency rating each class of offered certificates in accordance with the rating agencies' particular surveillance policies, unless the issuing entity requests a rating without surveillance. A rating agency will monitor the rating it issues on an ongoing basis and may update the rating after conducting its regular review of the issuing entity's creditworthiness or after conducting a review of the status of the rating upon becoming aware of any information that might reasonably be expected to result in a change of rating. The depositor has not requested that any rating agency not monitor their ratings of the offered certificates, and the depositor has not requested that any rating agency use any monitoring procedures other than their standard monitoring procedures.

MASTR Series 2007-3 Prospectus Supplement Form 424B5, May 17, 2007 at S-195 (emphasis added).

119.    However, in order to market the Certificates to the Defendants' principle clientele – namely large institutional investors and pension funds – the Certificates had to be assigned investment grade ratings by the Ratings Agencies.  As a result, the Certificates were provided the following credit ratings according to the Prospectus Supplement:

| Class | Original Class Principal Balance (1) | Approximate Initial Pass-Through Rate | Principal Type | Interest Type | Initial Rating of Offered Certificates (2) | |
|---|---|---|---|---|---|---|
| | | | | | Moody's | S&P |
| **Offered Certificates** | | | | | | |
| **Group 1** | | | | | | |
| Class 1-1A1 | $309,106,000 | (3) | Super Senior | Variable Rate | Aaa | AAA |
| Class 1-1A2 | $206,071,000 | (3) | Senior Support | Variable Rate | Aaa(4) | AAA(4) |
| Class 1-2A1 | $618,917,000 | (3) | Super Senior | Variable Rate | Aaa | AAA |
| Class 1-2A2 | $412,611,000 | (3) | Senior Support | Variable Rate | Aaa(4) | AAA(4) |
| Class 1-AIO | (5) | (6) | Senior, Interest-Only | Fixed Rate | Aaa | AAA |
| Class 1-A3 | $132,701,000 | (3) | Senior Mezzanine | Variable Rate | Aaa | NR |
| Class 1-M1 | $26,364,000 | (7) | Mezzanine | Variable Rate | Aa1 | NR |
| Class 1-M2 | $14,940,000 | (7) | Mezzanine | Variable Rate | Aa2 | NR |
| Class 1-M3 | $9,667,000 | (7) | Mezzanine | Variable Rate | Aa3 | NR |
| Class 1-M4 | $9,667,000 | (7) | Mezzanine | Variable Rate | A1 | NR |
| Class 1-M5 | $8,788,000 | (7) | Mezzanine | Variable Rate | A2 | NR |
| **Group 2** | | | | | | |
| Class 2-1A1 | $116,046,000 | (8) | Super Senior | Variable Rate | Aaa | AAA |
| Class 2-1A2 | $77,364,000 | (8) | Senior Support | Variable Rate | Aaa(4) | AAA(4) |
| Class 2-2A1 | $146,667,000 | (8) | Super Senior | Variable Rate | Aaa | AAA |
| Class 2-2A2 | $198,408,000 | (8) | Super Senior | Variable Rate | Aaa | AAA |
| Class 2-2A3 | $30,000,000 | (8) | Super Senior | Variable Rate | Aaa(4)(18) | AAA(4)(18) |
| Class 2-2A4 | $56,157,000 | (8) | Super Senior | Variable Rate | Aaa | AAA |
| Class 2-2A5 | $39,903,000 | (8) | Super Senior | Variable Rate | Aaa | AAA |
| Class 2-2A6 | $83,142,000 | (8) | Senior Support | Variable Rate | Aaa(4) | AAA(4) |
| Class 2-AIO | (9) | (10) | Senior, Interest-Only | Fixed Rate | Aaa | AAA |
| Class 2-M1 | $21,869,000 | (11) | Mezzanine | Variable Rate | Aaa | AA+ |
| Class 2-M2 | $12,792,000 | (11) | Mezzanine | Variable Rate | Aa1 | AA |
| Class 2-M3 | $5,777,000 | (11) | Mezzanine | Variable Rate | Aa1 | AA- |
| Class 2-M4 | $5,364,000 | (11) | Mezzanine | Variable Rate | Aa2 | A+ |
| Class 2-M5 | $4,952,000 | (11) | Mezzanine | Variable Rate | Aa3 | A |
| Class 2-M6 | $9,078,000 | (11) | Mezzanine | Variable Rate | A1 | A |
| Class 2-M7 | $9,490,000 | (11) | Mezzanine | Variable Rate | A3 | BBB |
| Class 2-M8 | $4,126,000 | (11) | Mezzanine | Variable Rate | Baa1 | BBB- |

MASTR Series 2007-3 Prospectus Supplement Form 424B5, May 17, 2007 at S-10.

120.     The ratings stated in the Prospectus Supplement were based on outdated models, lowered ratings criteria, and inaccurate loan information.  These flaws produced artificially high credit ratings for the Certificates, making them appear less risky than they really were.

**The Registration Statement Included Material**
**Misstatements and Omissions Regarding Credit Support**

121.    With respect to Credit Support, the Registration Statement provided as follows:

**CREDIT ENHANCEMENT**

The credit enhancement provided for the benefit of the offered certificates consists of:

-    excess interest;
-    the overcollateralization amounts[; and
-    the certificate insurance policy].

**Excess Interest**

Excess interest will be generated because the amount of interest collected on the loans for each due period is expected to be higher than the interest distributable on the certificates for the related distribution date. A portion of this excess interest will be applied both to absorb interest shortfalls and to create and maintain the required level of overcollateralization.

**Overcollateralization**

On the closing date, the overcollateralization amount will equal zero. As a result of the application of a portion of the excess interest in reduction of the principal balance of the Class A certificates, the applicable overcollateralization amount is expected to increase over time until it reaches the applicable required level of overcollateralization. However, subject to the satisfaction of certain loss and delinquency tests, the required percentage level of overcollateralization may increase or decrease over time. The overcollateralization amount is the first amount to absorb realized losses on the loans and designated unreimbursed expenses of the trust fund.

**[Certificate Insurance Policy**

The certificate insurer will issue a certificate guaranty insurance policy. Under this policy, the certificate insurer will irrevocably and unconditionally guaranty payment on each distribution date of timely payment of interest and ultimate payment of principal due on the Class A certificates. A payment by the certificate insurer under the certificate Insurance Policy is referred to in this prospectus supplement as an insured payment. The certificate insurer will be entitled to reimbursement from excess interest and the overcollateralization amount for all insured payments, together with interest. See "The Certificate Insurance Policy" in this prospectus supplement.]

70

MASTR Form S-3/A Registration Statement, filed April 4, 2006 at 16.

122.    Furthermore, the Prospectus Supplement provided that Credit Enhancement would include:

**Subordination**

The rights of the holders of the mezzanine certificates to receive distributions will be subordinated, to the extent described in this prospectus supplement, to the rights of the holders of the related senior certificates.

In addition, the rights of the holders of mezzanine certificates with higher numerical class designations to receive distributions will be subordinated to the rights of the holders of the related mezzanine certificates with lower numerical class designations, and the rights of the holders of the Class C certificates to receive distributions will be subordinated to the rights of the holders of the related mezzanine certificates, in each case to the extent described in this prospectus supplement.

Subordination is intended to enhance the likelihood of regular distributions on the more senior certificates in respect of interest and principal and to afford such certificates protection against realized losses on the loans.

See "Description of the Offered Certificates" in this prospectus supplement for additional information.

**Excess Interest**

The group 1 loans bear interest each month that in the aggregate is expected to exceed the amount needed to distribute monthly interest on the group 1 senior certificates and group 1 mezzanine certificates and to pay certain fees and expenses of the trust. The excess interest from the group 1 loans each month will be available to absorb realized losses on the group 1 loans, pay amounts in respect of interest shortfalls and net rate carryovers on such group 1 certificates, and to maintain overcollateralization at required levels as described in the pooling and servicing agreement.

The group 2 loans bear interest each month that in the aggregate is expected to exceed the amount needed to distribute monthly interest on the group 2 senior certificates and group 2 mezzanine certificates and to pay certain fees and expenses of the trust. The excess interest from the group 2 loans each month will be available to absorb realized losses on the group 2 loans, pay amounts in respect of interest shortfalls and net rate carryovers on such group 2 certificates, and to maintain overcollateralization at required levels as described in the pooling and servicing agreement.

See "Description of the Offered Certificates—Distribution of Group 1 Available Funds," "—Distribution of Group 2 Available Funds, " and "—Overcollateralization Provisions" in this prospectus supplement for additional information.

**Overcollateralization**

As of the closing date, the aggregate principal balance of the group 1 loans will exceed the aggregate class principal balance of the group 1 senior certificates, the group 1 mezzanine certificates and the Class 1-1P and Class 1-2P certificates by approximately $8,787,750, which is approximately equal to the initial class principal balance of the Class 1-C certificates. Such amount represents approximately 0.50% of the aggregate principal balance of the group 1 loans as of the cut-off date. On each distribution date, available excess interest, if any, will be used to reduce the aggregate class principal balance of the group 1 senior certificates and group 1 mezzanine certificates to create the overcollateralization required to be provided under the pooling and servicing agreement. We cannot assure you that sufficient interest will be generated by the group 1 loans to create or maintain the required level of overcollateralization.

As of the closing date, the aggregate principal balance of the group 2 loans will exceed the aggregate class principal balance of the group 2 senior certificates, the group 2 mezzanine certificates and the Class 2-1P and Class 2-2P certificates by approximately $4,126,657, which is approximately equal to the initial class principal balance of the Class 2-C certificates. Such amount represents approximately 0.50% of the aggregate principal balance of the group 2 loans as of the cut-off date. On each distribution date, available excess interest, if any, will be used to reduce the aggregate class principal balance of the group 2 senior certificates and group 2 mezzanine certificates to create the overcollateralization required to be provided under the pooling and servicing agreement. We cannot assure you that sufficient interest will be generated by the group 2 loans to create or maintain the required level of overcollateralization.

See "Description of the Offered Certificates—Overcollateralization Provisions" in this prospectus supplement for additional information.

MASTR Series 2007-3 Prospectus Supplement Form 424B5, May 17, 2007 at S-16.

123.    The above statements failed to disclose that the Ratings Agencies largely determined the amount and kind of Credit Support or Credit Enhancement to be provided for each Certificate, both before and after Ratings Agencies were formally "engaged" by UBS, in order for the Certificates to be assigned predetermined ratings.  The above statements also failed

to disclose that the amounts and kind of Credit Support the Ratings Agencies determined was appropriate for the Certificates, as specifically set forth in each Prospectus Supplement, were faulty, erroneous and inaccurate since the Ratings Agency models had not been updated and failed to accurately or adequately reflect the performance of the Certificate mortgage loans.

## COUNT I

### VIOLATION OF SECTION 11 OF THE SECURITIES ACT
### (Against Defendants MASTR, the Individual Defendants, UBSSEC and the Ratings Agency Defendants)

124.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

125.    This claim is brought by Plaintiff pursuant to Section 11 of the Securities Act and asserted on behalf of all other members of the Class who purchased or acquired MASTR Certificates pursuant and traceable to the Offering.

126.    Defendant MASTR is the registrant for the Offering and filed the Registration Statement and Prospectus as the issuer of the MASTR Certificates, as defined in Section 11(a)(1) of the Securities Act.

127.    The Individual Defendants were officers and/or directors of MASTR at the time the Registration Statement was filed in connection with the Offering became effective, and at the time of the issuance of the Prospectus Supplement, and with their consent were identified as such therein.   The Individual Defendants are liable for the misstatements and omissions in the Registration Statement alleged herein under Section 11(a)(1) of the Securities Act.

128.    Defendant UBSSEC served as the Underwriter for the Offering and qualifies as such according to the definition in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). As such, the Underwriter Defendant participated in the solicitation, offering, and sale of the Certificates to the investing public pursuant to the Registration Statement and the Prospectus Supplement.

129.    The Ratings Agency Defendants, in their capacity as NRSROs, provided expert credit ratings for the Offering and qualifies as an expert under the Securities Act.  As such, the

Ratings Agencies participated in the solicitation, offering, and sale of the Certificates to the investing public pursuant to the Registration Statement and the Prospectus Supplement.

130.    The Registration Statement and the Prospectus, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth above.  The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement and the Prospectus Supplement.

131.    These Defendants did not make a reasonable investigation and perform due diligence and did not possess reasonable grounds for believing that the statements contained in the Registration Statement and Prospectus Supplement were true, did not omit any material fact, and were not materially misleading.

132.    Plaintiff and the other Class members did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions contained in the Offering Documents.

133.    Plaintiff and other Class members sustained damages as a result of misstatements and omissions in the Registration Statement and the Prospectus Supplement, for which they are entitled to compensation.

134.    Plaintiff brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the Offering.

## COUNT II

**VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT**
**(Against Defendants UBSSEC and MASTR)**

135.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

136.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against the Underwriter Defendant, UBSSEC and Depositor, Defendant MASTR.

137.    By means of the Registration Statement and Prospectus Supplement, and by using means and instruments of transportation and communication in interstate commerce and of the mails, Defendants UBSSEC and MASTR, through the Offering, sold Certificates to Plaintiff and other members of the Class.

138.    UBSSEC and MASTR successfully solicited these purchases, motivated at least in part by their own financial interest.   UBSSEC and MASTR reviewed and participated in drafting the Prospectus Supplement.   Through ensuring the successful completion of the Offering, the Underwriter Defendant obtained substantial underwriting fees.

139.    The Registration Statement and the Prospectus Supplement, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth above.   The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement and the Prospectus.

140.    Defendants UBSSEC and MASTR as "sellers" owed to the purchasers of the Certificates, including Plaintiff and other Class members, the duty to perform due diligence and make a reasonable and diligent investigation of the statements contained in the Registration Statement and the Prospectus Supplement, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.   Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents as set forth above.

141.    Plaintiff and other members of the Class purchased or otherwise acquired Certificates pursuant to the defective Registration Statement and Prospectus Supplement. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents.

142.    Plaintiff, individually and representatively, hereby offers to tender to Defendants those securities which Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.   Class members who have sold their Certificates are entitled to rescissionary damages.

143.    By reason of the conduct alleged herein, these Defendants violated, and/or controlled a person who violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff and members of the Class who hold Certificates purchased pursuant and traceable to the Offering have the right to rescind and recover the consideration paid for their Certificates and hereby elect to rescind and tender their Certificates to the Defendants sued herein.  Plaintiff and Class members who have sold their Certificates are entitled to rescissionary damages.

## COUNT III

### VIOLATION OF SECTION 15 OF THE SECURITIES ACT
### (Against Defendants UBSRES and the Individual Defendants)

144.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

145.    This claim is brought by Plaintiff pursuant to Section 15 of the Securities Act and asserted on behalf of all Class members who purchased or acquired Certificates in the Offering.

146.    The Individual Defendants at all relevant times participated in the operation and management of MASTR and related subsidiaries, including the Issuing Trusts, and conducted

and participated, directly and indirectly, in the conduct of MASTR and the subsidiaries' business affairs.

147.    Defendant UBSRES also controlled all aspects of the business engaged in by MASTR, as MASTR was merely an SPE created for the sole purpose of acting as a pass-through for the issuance of the Certificates.  All of the officers and directors of MASTR, the Individual Defendants, were persons with control over the day to day business operations of UBSRES.

148.    As officers and/or directors of MASTR, the Individual Defendants had a duty to disseminate accurate and truthful information in the Registration Statement and the Prospectus.

149.    As set forth above, it is alleged that the Offering Documents issued in connection with the Offering contained material misstatements of fact, and omitted facts necessary to make the facts contained therein not misleading, in violation of Sections 11 and 12 of the Securities Act.

150.    Because of their positions of control and authority as senior officers and directors of MASTR, the Individual Defendants and UBSRES were able to, and did, control the contents of the Offering Documents which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.   The Individual Defendants and UBSRES were therefore "controlling persons" of MASTR within the meaning of Section 15 of the Securities Act.

151.    In addition, because of its sole ownership of the sponsor and servicers of the Trusts' assets and its control and authority as Parent Corporation, Defendant UBSRES was able to, and did, control the contents of the Offering Documents which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

Defendant UBSRES was therefore a "controlling person" within the meaning of Section 15 of the Securities Act.

152.    Plaintiff and other Class members purchased Certificates issued pursuant to the Offering.  The Offering was conducted pursuant to the Registration Statement and the Prospectus Supplement specified herein.

153.    The Offering Documents, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement and the Prospectus Supplement.

154.    Plaintiff and the Class did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions in the Registration Statement and the Prospectus Supplement.

155.    Plaintiff and the Class have sustained damages as a result of the misstatements and omissions of the Registration Statement and the Prospectus Supplement, for which they are entitled to compensation.

156.    Plaintiff brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the Offering.

## COUNT IV

**VIOLATION OF SECTION 15 OF THE SECURITIES ACT**
**(Against the Ratings Agency Defendants)**

157.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

158.     This cause of action is brought pursuant to § 15 of the Securities Act against the Ratings Agencies as control persons of the Issuing Trusts, which were created for the purpose of issuing the Certificates.

159.     As set forth above, the Issuing Trusts, as the issuer of the Certificates herein, are strictly liable for misstatements and omissions contained in the Offering Documents under Section 11 of the Securities Act.

160.     Each of the Ratings Agency Defendants, by virtue of this control over the Issuing Trusts, was, at the time of the wrongs alleged herein, a controlling person of the Issuing Trusts within the meaning of Section 15 of the Securities Act.

161.     The Issuers of the Certificates under the Securities Act were in all instances common law trusts (the "Issuing Trusts").  The Issuing Trusts were shell entities created solely for the purpose of issuing the Certificates. The Issuing Trusts had no offices, officers, directors or assets (apart from the mortgage loan collateral and any applicable insurance policies).  As alleged herein, the policies and management of the Issuing Trusts were controlled by a securitization structure devised jointly by UBS and the Rating Agencies and which, in all instances, required final approval of the Ratings Agencies.  As alleged herein, since it was this structure that supported assignment of the highest investment grade credit ratings, the Certificates could not be issued or sold absent the Rating Agencies approval of the structure. The securitization structure encompassed the subordination of senior and junior classes as reflected in the Offering Documents:

162.     The securitization structure also governed the central rights of Certificateholders in terms of credit enhancement, or credit support.   The credit enhancement included the

subordination structure, as well as the amount of overcollateralization and distribution of any excess spread.

163.    Because there would be no Offering, and therefore no Issuing Trust, without the Ratings Agencies' structure and approval, in the form of a AAA/maximum security rating, the Ratings Agencies were able to influence and direct the actions of the Issuing Trusts.  By virtue of this control and ability to direct the actions of the Issuing Trusts, the Ratings Agency Defendants were control persons of such within the meaning of Section 15 of the Securities Act.

164.    The Ratings Agencies' control, position and influence made them privy to, and provided them with actual knowledge of, the material facts and omissions concealed from Plaintiff and the other Class members.

165.    The Ratings Agency Defendants were responsible periodic monitoring of the Trusts' assets and administration.

166.     By virtue of the wrongful conduct alleged herein, the Ratings Agencies are liable to Plaintiff and the other Class members for the damages sustained.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Awarding such additional equitable, injunctive or other relief as deemed

appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury

Dated: February 22, 2009

Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

By: _____

Joel P. Laitman
Christopher Lometti
Daniel B. Rehns
Kenneth M. Rehns
150 East 52nd Street, Thirtieth Floor
New York, New York 10022
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
*drehns@cohenmilstein.com*
*jlaitman@cohenmilstein.com*
*clometti@cohenmilstein.com*
*krehns@cohenmilstein.com*

Steven J. Toll
S. Douglas Bunch
1100 New York Avenue, NW, Suite 500 West
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
*stoll@cohenmilstein.com*
*dbunch@cohenmilstein.com*

*Counsel for Plaintiff and the Proposed Class*

82

## **CERTIFICATE OF SERVICE**

I, Daniel B. Rehns, counsel for the Plaintiff, hereby certify that on February 22, 2009, I filed an original of the foregoing with the Clerk of the Court via the Court's CM/ECF System and delivered a copy to all parties named herein and/or counsel of record in the within action by hand or first-class mail.

Daniel B. Rehns

83

## CERTIFICATION OF SECURITIES CLASS ACTION COMPLAINT

I, Malcolm Auble, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.    I am the Chairman of The Locals 302 and 612 of the International Union of Operating Engineers – Employers Construction Industry Retirement Trust (the "Trust").

2.    I have reviewed the complaint filed in this case (the "Complaint"), and authorize the filing thereof.

3.    The Trust is willing to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

4.    During the Class Period (as defined in the Complaint), the Trust purchased and/or sold the security that is the subject of the Complaint as set forth on the attached Schedule B.

5.    The Trust did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.    During the three-year period preceding the date of my signing this Certification, the Trust has not served nor sought to serve as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act except those actions listed in the attached Schedule A.

7.    The Trust will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any possible recovery except for an award, as ordered by the court, for reasonable costs and expenses directly relating to its representation of the Class.

Signed under the penalties of perjury, this 22 day of February 2010.

Malcolm J. Auble

Malcolm Auble, on behalf of the
The Locals 302 and 612 of the International Union
of Operating Engineers – Employers Construction
Industry Retirement Trust

## SCHEDULE A

*In re The PMI Group, Inc., Sec. Litig.*, No. 08-cv-01405(SI) (N.D. Cal)

*In re UTStarcom Secs. Litig.*, No. 04-cv-04908 (JW) (N.D. Cal)

*In re Lehman Bros. Mortgage-Backed Securities Litigation*, No. 08-cv-6762 (LAK) (S.D.N.Y.)

*Zwickel v. Taro Pharmaceutical Industries, Ltd., et al.*, No. 04-cv-5969 (RMB) (S.D.N.Y.)

*In re FBR Inc. Sec. Litig.*, No. 05-cv-04617 (RJH) (S.D.N.Y.)

*Candelore v. Force Protection Inc., et al.*, No. 08-cv- 00845 (CWH) (D.S.C.)

*Burzotta, et al., v. Manulife Financial Corporation, et al.*, No. 09-cv-6185 (S.D.N.Y.)

### SCHEDULE B

| DATE | PURCHASED | PRICE PER UNIT |
|------|-----------|----------------|
| May 14, 2007 | 1,265,368.36 – MASTR Adjustable Rate Mortgage Trust, Series 2007-3 | $0.9741 |