NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                                         :
PENSION TRUST FUND FOR                    :
OPERATING ENGINEERS, on Behalf of   :     **Hon. Dennis M. Cavanaugh**
Itself and All Others Similarly Situated,       :
                                                         :     AMENDED OPINION
         Plaintiff,                                 :
                                                         :     Civil Action No.10-898 (DMC)(MF)
   v.                                               :
                                                         :
MORTGAGE ASSET SECURITIZATION   :
TRANSACTIONS, INC.; DAVID               :
MARTIN; PER DYRVIK; HUGH                :
CORCORAN; PETER SLAGOWITZ;        :
UBS AMERICAS INC.; UBS                      :
SECURITIES LLC; and UBS REAL           :
ESTATE SECURITIES INC,                       :
                                                         :
         Defendants.                              :
_____

DENNIS M. CAVANAUGH, U.S. District Judge

      This case comes before the Court on Defendants' Motion to Dismiss pursuant to FED. R.

CIV. P. 12(b)(1) and 12(b)(6). The motion was decided without oral argument pursuant to Fed.

R. Civ. P. 78. After careful review of the parties' submissions and based upon the following,

Defendants' motion is granted.

I.     BACKGROUND AND PROCEDURAL HISTORY[1]

---

[1] The following facts are taken from the Amended Complaint, the factual allegations in which are accepted as true for purposes of Defendants' motion to dismiss, as well as from public filings referenced and relied upon in the Amended Complaint and public information of which the court may take judicial notice.

This case is a securities class action suit related to the collapse of the mortgage industry and subsequent financial crisis of recent years. Lead Plaintiff is the Pension Trust Fund for Operating Engineers ("Plaintiff"). (Amended Class Action Complaint ("AC") ¶ 1 (ECF No. 48)). Plaintiff is suing on the basis of allegedly false and misleading statements contained in the Offering Documents for certain Mortgage Backed Securities purchased from Defendants. (Id.) Plaintiff bases their suit on strict liability and negligence claims brought pursuant to the Securities Act of 1933 ("The Securities Act"). (Id.) Defendants can be grouped into three categories. The first category includes UBS Americas, UBS Securities, and UBS Real Estate (collectively, the "UBS Defendants"). (Id. at ¶¶ 25-27). The second category includes David Martin ("Martin"), Per Dyrvik ("Dyrvik"), Hugh Corcoran ("Corcoran"), and Peter Slagowitz ("Slagowitz") (collectively, the "Individual Defendants"). (Id. at ¶¶ 31-34). The final defendant in this action is Mortgage Asset Securitization Transactions, Inc. ("MASTR"). (Id. at ¶ 29). MASTR Trust 2007-3 (the "Trust") is a New York common law trust and was the "Issuing Entity" for the Mortgage Backed Securities at issue in this case.[2] (Id. at 30). Due to the complexity of the issues involved, the Court will briefly summarize some of the more general facts underlying this case before discussing the specific facts of Plaintiff's claims.

Mortgage Backed Securities, or "MBS," are the result of financial innovations of the 1990's, which saw the advantages of turning traditional mortgage loans into asset securitizations. (Id. at ¶ 62). Traditionally, a mortgage loan involved only two participants: a lending institution, also known as an originator, and a prospective buyer, who in exchange for a mortgage, executed

---

[2] The Trust has been voluntarily dismissed as a defendant in this case. (ECF No. 66).

a promissory note to repay the principal and interest of the loan. (Id. at ¶ 60). The lending institution would hold a lien against the home as collateral in case the home buyer defaulted on a payment obligation. (Id.) The introduction of asset securitization, however, expanded this model to involve several new transactions and participants.

In an asset securitization, originators sell mortgages to third-party financial institutions. (Id. at 63). By selling the mortgages, the originators receive fees in connection with the issuance of the loan, secure up-front proceeds upon selling the loan into the secondary market, and eliminate any risk they might carry associated with borrower defaults. (Id. at ¶ 63). The financial institutions will then securitize those loans by pooling them together, depositing them into a trust, and selling interests in the trusts to investors in the form of MBS. (Id. at ¶¶ 64-65). When borrowers make interest or principal payments on the loans, the cash-flow is distributed to holders of the MBS in order or priority based on the specific type of MBS, or "tranche," that the investor holds. (Id. at ¶ 65). The ranking of these tranches reflects the degree of risk associated with a particular MBS. (Id. at ¶ 72). The highest tranche, also known as a "senior" tranche, is the first to receive its share of the proceeds, and the last to absorb any losses. (Id. at ¶ 65). These senior tranches typically receive the highest rating from ratings agencies, usually a AAA rating. (Id. at ¶ 66). The middle tranches, or "mezzanine" tranches, are next in order of payment, and typically receive a rating between AA and BBB, based on their order of priority. (Id.). At the bottom of the order are the equity tranches. (Id. at ¶ 67).

As MBS are valued and rated based on the degree of risk associated with the underlying loans, investors typically rely on accurate information concerning two critical factors: proper underwriting of the loans, and proper appraisal of the real estate. (Id. at ¶ 72). In assessing the

borrowers ability to repay a loan, underwriters often assess a borrower's total monthly debt to income ratio ("DTI Ratio"). (Id. at ¶ 73). This critical metric reflects a percentage of a borrower's monthly gross income that goes toward paying that borrower's debts, with higher DTI Ratios representing a greater risk of default. (Id.). If the DTI Ratios are understated in prospectuses and mortgage loan schedules filed with the SEC, investors might find higher than expected defaults and losses for the mortgage loans in the securitization pool. (Id.) Equally important to investors are accurate appraisals of the real estate guaranteeing the loan. (Id. at ¶ 74). Accurate appraisals can help calculate a Loan to Value Ratio ("LTV Ratio"), another critical metric commonly used to evaluate the price and risk of MBS. (Id.). An LTV Ratio reflects another measure of the risk associated with a mortgage, with a higher LTV Ratio signaling a riskier loan. (Id. at ¶ 75). Again, this critical piece of information is frequently provided in prospectuses, and some prospectuses even guarantee certain LTV Ratio limits for the loans that will support the MBS certificates. (Id. at ¶76).

      In the instant action, Plaintiff is suing based on alleged misstatements and omissions in the offering documents filed by Defendants with the Securities and Exchange Commission (the "SEC") (the "Offering Documents"). (Id. at ¶¶ 7-20). These alleged misstatements and omissions involve the loan underwriting guidelines, LTV Ratios, DTI Ratios, appraisal standards and procedures, and income, employment and credit history verification processes. (Id. at ¶¶ 8-9, 87-181).

      Plaintiff's claims arise out of Defendants' sale of MBS certificates through a public offering on or about May 14, 2007 (the "Offering"). Specifically, on September 18, 2007, Plaintiff purchased MASTR Pass-Through Certificates, Series 2007-3, series 12A1, with a face

value of $5,123,977 directly from UBS Securities.  (Id. at ¶ 24).  These certificates are MBS, collateralized by loans principally originated by Countrywide Home Loans, Inc. ("Countrywide") and IndyMac Bank, F.S.B. ("IndyMac") (collectively, the "Originators"), either directly or through various third party originators.[3]  (Id. at ¶ 3).  Plaintiff alleges that its damages are directly attributable to the Defendants' misstatements and omissions concerning the practices of the Originators.

During the housing boom of the last decade, an atmosphere developed around the industry in which lenders offered more and more loans to higher-risk borrowers, or those with poor credit history or little or no income documentation.  (Id. at ¶ 81).  Plaintiff asserts that, as part of this atmosphere, "Countrywide and IndyMac wholly disregarded underwriting standards in an attempt to make immense profits originating loans and then selling them into securitizations."  (Id. at 87).  With respect to the Defendants in this action, Plaintiff argues that Defendants failed to disclose information concerning the lending practices of Countrywide and IndyMac.  Plaintiff cites generalized language in the Offering Documents, claiming that this language contains material misrepresentations or omissions about three specific practices: (1) the existence and application of underwriting guidelines by the Originators; (2) the appraisal practices and LTV Ratios used to describe properties backing the MBS; and (3) the DTI Ratios of the borrowers.  (Id. at 169-175).

Based on these allegations, on February 22, 2010, Locals 302 and 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust filed a

---

[3] Together, Countrywide and IndyMac originated over 91% of the loans placed in the MASTR Trust.  (Id. at ¶¶ 88, 106).

5

complaint against Defendants, the MASTR Trust, and two ratings agencies.[4]  On October 19, 2010, this Court signed an Order granting a motion to appoint Pension Trust Fund for Operating Engineers as lead plaintiff.  (ECF No. 43).  On February 14, 2011, Defendants filed the instant Motion to Dismiss.  (ECF. No. 59).  Defendants allege that Plaintiff's claims are time-barred, that Plaintiff has failed to state a claim, that Plaintiff has failed to plead a cognizable economic loss, and that Plaintiff's claims under Section 15 of the Securities Act are barred by the applicable statute of repose.

II.     LEGAL STANDARD AND APPLICABLE LAW

A. Motion to Dismiss

In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff.  See Warth v. Seldin, 422 U.S. 490, 501 (1975); Trump Hotels & Casino Resorts, Inc., v. Mirage Resorts Inc., 140 F.3d 478, 483 (3d Cir. 1998).  If, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears beyond doubt that no relief could be granted "under any set of facts which could prove consistent with the allegations," a court shall dismiss a complaint for failure to state a claim.  See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).  In Bell Atl. Corp. v. Twombly, the Supreme Court clarified the Fed. R. Civ. P. 12(b)(6) standard.  See 127 S.Ct. 1955 (2007).  Specifically, the Court "retired" the language contained in Conley v. Gibson, 355 U.S. 41 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim,

---

[4]The Trust and the ratings agencies have since been dismissed from this lawsuit.

which would entitle him to relief." Twombly, 127 S.Ct. at 1968 (citing Conley, 355 U.S. at 45-46). Instead, the Supreme Court instructed that "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 127 S.Ct. at 1965.

B. The Securities Act

Section 11 of the Securities Act permits recovery by purchasers of securities where "a registration statement, as of its effective date: (1) contained an untrue statement of material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statements therein not misleading." See In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 269 (3d. Cir., 2006). It is a "virtually absolute liability provision[], which do[es] not require plaintiffs to allege that defendants possessed any scienter." Id. (quoting In re Adams Golf, Inc. Secs. Litig., 381 F.3d 267, 274 n. 7 (3d Cir. 2004)). Indeed, "[i]f a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case." Id. (quoting Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983).

Whereas Section 11 concerns misstatements and omissions in a registration statement, Section 12(a)(2) deals with misrepresentations and omissions in a prospectus or other solicitation material. Section 12(a)(2) creates a private cause of action against anyone who offers or sells a security "by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(a)(2); In re Suprema Specialties, 438 F.3d at 269. Similar to Section 11, Section 12(a)(2) is a "virtually

7

absolute" liability provision that does not require an allegation that defendants possessed scienter. See In re Suprema Specialties, 438 F.3d at 269. To state a prima facie claim, plaintiffs must allege they purchased securities pursuant to a materially false or misleading prospectus or oral communication. Id. at 269-70.

Section 15 of the Securities Act provides for joint and several liability against those who "control" violators of Section 11 or Section 12 of the Securities Act. 15 U.S.C. § 77o. Plaintiffs must show that the defendant controlled another person or entity and that the controlled person or entity committed a predicate offense under the Securities Act. See In re Suprema Specialties, 438 F.3d at 284. Courts should consider not only actual exercise of control, but also the potential power to influence and control. See In Re Schering-Plough Corp./ Enhance Securities Litig., No. 08-397, 2009 U.S. Dist. LEXIS 78852 at *11-12 (D.N.J. Sept. 2, 2009) (DMC).

III.     DISCUSSION

A. Statute of Limitations

The statute of limitations applicable to securities actions is the one-year/three-year limitations period enunciated by the Supreme Court in Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350 (1991), and codified in 15 U.S.C. § 77m and 78i(e) of the Securities Act and the Exchange Act, respectively. Under Lampf, claims alleging a violation of securities law must be filed within one year of the plaintiff's discovery of the facts constituting the violation and within three years of the violation. Id. at 363. In a securities action, the plaintiff bears the burden of pleading compliance with the statute of limitations, since "the statute of limitations . . . is a substantive requirement rather than a procedural one." In re Prudential Ins. Co. of Am. Sales

Practices Litig., 975 F.Supp. 584, 598 (D.N.J.1996) (citing Rolo v. City Investing Co. v. Liquidating Trust, 845 F.Supp. 182, 243 n. 38 (D.N.J.1994)).

With regards to the discovery prong of the Lampf rule, plaintiffs must set forth "the time and circumstances of the discovery of the fraudulent statement, the reason why discovery was not made earlier, and the diligent efforts plaintiff[s] undertook in making such discovery." Urbach v. Sayles, 779 F.Supp. 351, 364 (D.N.J.1991). In order to preserve a cause of action that fails to comply with these requirements, a plaintiff may be required to amend their complaint so as to plead compliance with the statute of limitations. See, e.g., Alfaro v. E.F. Hutton & Co., 606 F.Supp. 1100, 1112 (E.D.Pa.1985) (dismissing complaint without prejudice for failure to plead compliance with applicable statute of limitations). If it is clear, however, that even with the benefit of amending their complaint, a Plaintiff still could not prove compliance with the statute of limitations, than an action may be dismissed with prejudice. See, e.g., In re Morgan Stanley Mortgage Pass-Through Certificates Litigation, No.09-2137, 2010 WL 3239430, at **7-8 (S.D.N.Y., Aug. 17, 2010) (LTS) (denying leave to amend because publicly available information would make amendment futile).

In this case, Defendants argue that "Plaintiff has not even attempted to satisfy its pleading obligations under Section 13." (Def.'s Br. 21). The only language contained in the Complaint which goes to this requirement are the statements that Plaintiff "brought this action within one year after the discovery of the untrue statements and omissions" and that "Plaintiff and the other Class members did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions contained in the Offering Documents [or in the Registration Statements and the Prospectus Statement]" (AC ¶ 194, 196, 212, 214). Plaintiff notes that

9

"[s]hould the Court require more particularized allegations, such information could easily be included in an amended Complaint." (Pl.'s Br. 40 n.23). In response, Defendant argues that such an amendment would be futile, as information made publicly available more than one year prior to the filing of the original complaint put Plaintiff on inquiry notice of its claims. (Def.'s Reply Br. 11 (ECF. No. 67)). The Court agrees with Defendant, but only to the extent that Plaintiff has not complied with the pleading requirements of Section 13.

Plaintiffs must plead compliance with Section 13 with particularity. Kress v. Hall-Houston Oil Co., No. 92-543, 1993 WL 166274, at * 2 (D.N.J., May 12, 1993) (Wolin, J.) Failure to provide concrete facts in support of an allegation of compliance with Section 13 warrants dismissal. Id. at *5. This District has previously found a Plaintiff's statement that "his claims were brought within one year of the date on which he first became aware of the fraud and within three years of the date of his respective purchases" insufficient to plead compliance with Section 13. Id. Here, Plaintiff's statement that it "brought this action within one year after the discovery of the untrue statements and omissions" is similarly insufficient. Plaintiff alleges no facts setting forth the time and circumstances of the discovery of the Defendants' allegedly actionable statements, the reason why discovery was not made earlier, or the diligent efforts undertaken in making such discovery. Plaintiff's further statement that "Plaintiff and the other Class members did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions contained in the Offering Documents [or in the Registration Statements and the Prospectus Statement]" does nothing to change the sufficiency of the complaint, as this statement is equally conclusory. Therefore, the Amended Complaint will be dismissed for failure to plead compliance with Section 13 of the Securities Act. Dismissal with

prejudice is not warranted, however. While Plaintiff has not complied with the technical requirements of Section 13, Plaintiff's allegations are sufficiently particularized to convince this Court that granting leave to amend would not be "futile." Therefore, Plaintiff will be granted leave to amend its complaint so as to comply with the pleading requirements of Section 13.

IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted, without prejudice. An appropriate Order accompanies this Opinion.

S/ Dennis M. Cavanaugh
Dennis M. Cavanaugh, U.S.D.J.

Date:      Sept. 29th, 2011
Original:  Clerk
cc:        All Counsel of Record
           Hon. Mark Falk, U.S.M.J.
           File