NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| PENSION TRUST FUND FOR OPERATING ENGINEERS, on Behalf of Itself and All Others Similarly Situated, | Hon. Claire C. Cecchi |
| Plaintiff, | OPINION |
| v. | Civil Action No.10-898 (CCC)(JAD) |
| MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.; DAVID MARTIN; PER DYRVIK; HUGH CORCORAN; PETER SLAGOWITZ; UBS AMERICAS INC.; UBS SECURITIES LLC; and UBS REAL ESTATE SECURITIES INC, | |
| Defendants. | |

**CLAIRE C. CECCHI, U.S.D.J.**

This matter comes before the Court on Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint. ECF No. 78. The motion was decided without oral argument pursuant to Fed. R. Civ. P. 78. After careful review of the parties' submissions and based upon the following, Defendants' motion is **granted**.

## I. BACKGROUND AND PROCEDURAL HISTORY[1]

---

[1] The following facts are taken from the Second Amended Complaint, the factual allegations in which are accepted as true for purposes of Defendants' Motion, as well as from public filings referenced and relied upon in the Amended Complaint and public information of which the court may take judicial notice.

This case is a securities class action suit related to the collapse of the mortgage industry and subsequent financial crisis of recent years. Lead Plaintiff is the Pension Trust Fund for Operating Engineers ("Plaintiff"). Second Amended Class Action Complaint ("SAC") ¶ 1, ECF No. 75. Plaintiff is suing on the basis of allegedly false and misleading statements contained in the Offering Documents for certain Mortgage Backed Securities purchased from Defendants. SAC ¶ 1. Plaintiff bases its suit on strict liability and negligence claims brought pursuant to the Securities Act of 1933 (the "Securities Act"). SAC ¶ 1. Defendants can be grouped into three categories. The first category includes UBS Americas, UBS Securities, and UBS Real Estate (collectively, the "UBS Defendants"). SAC ¶¶ 25-27. The second category includes David Martin ("Martin"), Per Dyrvik ("Dyrvik"), Hugh Corcoran ("Corcoran"), and Peter Slagowitz ("Slagowitz") (collectively, the "Individual Defendants"). SAC ¶¶ 31-34. The final defendant in this action is Mortgage Asset Securitization Transactions, Inc. ("MASTR"). SAC ¶ 29. MASTR Trust 2007-3 (the "Trust") is a New York common law trust and was the "Issuing Entity" for the Mortgage Backed Securities at issue in this case.[2]

In the instant action, Plaintiff is suing based on alleged misstatements and omissions in the offering documents filed by Defendants with the Securities and Exchange Commission (the "SEC") (the "Offering Documents"). SAC ¶¶ 1-21. These alleged misstatements and omissions involve the loan underwriting guidelines, Loan to Value ("LTV") Ratios, Debt to Income ("DTI") Ratios,

---

[2] A discussion of the underlying factual issues related to Mortgage Backed Securities and Plaintiff's allegations is set forth in greater detail in this Court's Amended Opinion granting Defendants' Motion to Dismiss the First Amended Complaint without prejudice. See Pension Trust Fund for Operating Engineers v. Mortgage Asset Securitization Transactions, Inc., et. al., No. 10-898, 2011 WL 4550191 (D.N.J. Sept. 29, 2011). Those facts will only be set forth here as necessary to set a basis for the present motion before this Court.

appraisal standards and procedures, and income, employment and credit history verification processes. SAC ¶¶ 8-9.

Plaintiff's claims arise out of Defendants' sale of Mortgage Backed Securities ("MBS") certificates through a public offering on or about May 14, 2007 (the "Offering"). Specifically, on September 18, 2007, Plaintiff purchased MASTR Pass-Through Certificates, Series 2007-3, series 12A1, with a face value of $5,123,977 directly from UBS Securities. SAC ¶ 24. These certificates are MBS, collateralized by loans principally originated by Countrywide Home Loans, Inc. ("Countrywide") and IndyMac Bank, F.S.B. ("IndyMac") (collectively, the "Originators"), either directly or through various third party originators.[3] SAC ¶ 3. Plaintiff alleges that its damages are directly attributable to the Defendants' misstatements and omissions concerning the practices of the Originators.

Plaintiff asserts that "Countrywide and IndyMac wholly disregarded underwriting standards in an attempt to make immense profits originating loans and then selling them into securitizations." SAC ¶ 86. Plaintiff argues that Defendants failed to disclose information concerning the lending practices of Countrywide and IndyMac. Plaintiff cites generalized language in the Offering Documents, claiming that this language contains material misrepresentations or omissions about the existence and application of underwriting guidelines by the Originators, about the appraisal practices and LTV Ratios used to describe properties backing the MBS, and about the DTI Ratios of the borrowers. SAC ¶¶ 168-180.

Based on these allegations, on February 22, 2010, Locals 302 and 612 of the International

---

[3] Together, Countrywide and IndyMac originated over 91% of the loans placed in the MASTR Trust. SAC ¶¶ 87, 105.

Union of Operating Engineers-Employers Construction Industry Retirement Trust filed a complaint against Defendants, the MASTR Trust, and two ratings agencies.[4] On October 19, 2010, this Court signed an Order granting a motion to appoint Pension Trust Fund for Operating Engineers as Lead Plaintiff. ECF No. 43. On September 29, 2011, this Court filed an Amended Opinion and Order granting Defendants' Motion to Dismiss without prejudice. ECF Nos. 72, 73. In so doing, this Court held that Plaintiff failed to properly plead compliance with Section 13 of the Securities Act, but granted Plaintiff leave to amend the Complaint so as to comply with these pleading requirements.

Plaintiff filed the SAC on October 13, 2011, adding ten new paragraphs in an effort to comply with this Court's Amended Opinion and Order. SAC ¶¶ 187-196. Defendants filed the instant Motion on December 16, 2011. Defendants again argue that Plaintiff's claims are time barred, because Plaintiff failed to plausibly plead facts demonstrating why a reasonable investigation of the "storm warnings" would not have revealed its claims. Defs.' Mot. Br. 18-31. Defendants also assert that Plaintiff lacks standing to bring claims based on securities it did not purchase, that Plaintiff failed to state a claim under Sections 11 and 12(A)(2) of the Securities Act, that Plaintiff did not plead a cognizable economic loss, and that Plaintiff has no claim for control person liability under Section 15 of the Securities Act. Defs.' Mot. Br. 32-40. Plaintiff filed its Opposition on January 30, 2012. ECF No. 80. Defendants filed a Reply on March 2, 2012. The matter is now before this Court.

## II. LEGAL STANDARD AND APPLICABLE LAW

A. Motion to Dismiss

---

[4]The Trust and the ratings agencies have since been dismissed from this lawsuit.

In deciding a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff. See Warth v. Seldin, 422 U.S. 490, 501 (1975); Trump Hotels & Casino Resorts, Inc., v. Mirage Resorts Inc., 140 F.3d 478, 483 (3d Cir. 1998). If, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears beyond doubt that no relief could be granted "under any set of facts which could prove consistent with the allegations," a court shall dismiss a complaint for failure to state a claim. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). In Bell Atl. Corp. v. Twombly, the Supreme Court clarified the Fed. R. Civ. P. 12(b)(6) standard. 127 S.Ct. 1955 (2007). Specifically, the Court "retired" the language contained in Conley v. Gibson, 355 U.S. 41 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief." Twombly, 127 S.Ct. at 1968 (citing Conley, 355 U.S. at 45-46). Instead, the Supreme Court instructed that "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 127 S.Ct. at 1965.

B. The Securities Act

Section 11 of the Securities Act permits recovery by purchasers of securities where "a registration statement, as of its effective date: (1) contained an untrue statement of material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statements therein not misleading." See In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 269 (3d. Cir. 2006). It is a "virtually absolute liability provision[], which do[es] not require plaintiffs to allege that defendants possessed any scienter." Id. (quoting In re Adams

5

Golf, Inc. Secs. Litig., 381 F.3d 267, 274 n. 7 (3d Cir. 2004)). Indeed, "[i]f a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case." Id. (quoting Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983)).

Whereas Section 11 concerns misstatements and omissions in a registration statement, Section 12(a)(2) deals with misrepresentations and omissions in a prospectus or other solicitation material. Section 12(a)(2) creates a private cause of action against anyone who offers or sells a security "by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(a)(2); In re Suprema Specialties, 438 F.3d at 269. Similar to Section 11, Section 12(a)(2) is a "virtually absolute" liability provision that does not require an allegation that defendants possessed scienter. See In re Suprema Specialties, 438 F.3d at 269. To state a prima facie claim, plaintiffs must allege they purchased securities pursuant to a materially false or misleading prospectus or oral communication. Id. at 269-70.

Section 15 of the Securities Act provides for joint and several liability against those who "control" violators of Section 11 or Section 12 of the Securities Act. 15 U.S.C. § 77o. Plaintiffs must show that the defendant controlled another person or entity and that the controlled person or entity committed a predicate offense under the Securities Act. See In re Suprema Specialties, 438 F.3d at 284. Courts should consider not only actual exercise of control, but also the potential power to influence and control. See In Re Schering-Plough Corp./ Enhance Securities Litig., No. 08-397, 2009 U.S. Dist. LEXIS 78852 at *11-12 (D.N.J. Sept. 2, 2009).

## III. DISCUSSION

A. Statute of Limitations

The statute of limitations applicable to this action is the one-year/three-year limitations period enunciated by the Supreme Court in <u>Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson</u>, 501 U.S. 350 (1991), and codified in 15 U.S.C. § 77m and 78i(e) of the Securities Act and the Exchange Act, respectively. Under <u>Lampf</u>, claims alleging a violation of securities law must be filed within one year of the plaintiff's discovery of the facts constituting the violation and within three years of the violation. <u>Id.</u> at 363. In a securities action, the plaintiff bears the burden of pleading compliance with the statute of limitations, since "the statute of limitations . . . is a substantive requirement rather than a procedural one." <u>In re Prudential Ins. Co. of Am. Sales Practices Litig.</u>, 975 F.Supp. 584, 598 (D.N.J.1996) (citing <u>Rolo v. City Investing Co. v. Liquidating Trust</u>, 845 F.Supp. 182, 243 n. 38 (D.N.J.1994)).

With regards to the discovery prong of the <u>Lampf</u> rule, plaintiffs must set forth "the time and circumstances of the discovery of the fraudulent statement, the reason why discovery was not made earlier, and the diligent efforts plaintiff[s] undertook in making such discovery." <u>Urbach v. Sayles</u>, 779 F.Supp. 351, 364 (D.N.J.1991). In order to preserve a cause of action that fails to comply with these requirements, a plaintiff may be required to amend their complaint so as to plead compliance with the statute of limitations. <u>See, e.g.</u>, <u>Alfaro v. E.F. Hutton & Co.</u>, 606 F.Supp. 1100, 1112 (E.D.Pa.1985) (dismissing complaint without prejudice for failure to plead compliance with applicable statute of limitations). If it is clear, however, that even with the benefit of amending their complaint, a Plaintiff still could not prove compliance with the statute of limitations, then an action may be dismissed with prejudice. <u>See, e.g.</u>, <u>In re Morgan Stanley Mortgage Pass-Through</u>

Certificates Litigation, No.09-2137, 2010 WL 3239430, at *7-8 (S.D.N.Y. Aug. 17, 2010) (denying leave to amend because publicly available information would make amendment futile).

In assessing statute of limitations issues under Section 13 of the Securities Act, the Third Circuit applies an inquiry notice standard.[5] Benak v. Alliance Capital Mgmt. L.P., 435 F.3d 396, 400 (3d Cir. 2006). "To the extent a securities fraud plaintiff was on inquiry notice of the basis for claims more than one year prior to bringing the action, his or her claim is subsequently time-barred by the requisite statute of limitations." Id. (citing In re NAHC, inc. Sec. Litig., 306 F.3d 1314, 1325 (3d Cir. 2002)). The one year period for the statute of limitations begins to run when a plaintiff discovers or in the exercise of reasonable diligence should have discovered the basis for their claim. Id. Whether a plaintiff should have known of the basis of their claims depends on whether they had sufficient information of possible wrongdoing to place them on inquiry notice, or to have excited "storm warnings" of culpable activity. Id. The test for storm warnings is an objective one, and depends on whether a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning. Id. Investors are presumed to have read prospectuses, quarterly reports, and other information relating to their investments, and are "charged with knowledge of publicly available news articles and analyst's reports to the extent that they constitute storm warnings sufficient to trigger inquiry notice." Id. (citing In re Initial Public Offering Sec. Litig., 341 F.Supp.2d 328, 345 (S.D.N.Y. 2004)).

---

[5] Plaintiff has argued that this Court should apply the "discovery" standard set forth by the Supreme Court in Merck & Co., Inc., v. Reynolds, 130 S.Ct. 1784 (2010). The Court disagrees. The Merck standard applied to a securities fraud action under § 10(b) of the Securities Act of 1934, and not to the Section 11 and 12(b) claims under the Securities Act of 1933 at issue here. Further, while some other Circuits have adopted the Merck standard for Section 11 and 12(b) claims, the Third Circuit has yet to do so.

If a defendant successfully establishes the presence of storm warnings, "the burden shifts to the [plaintiff] to show that they exercised reasonable due diligence and yet were unable to discover their injuries." Id. (citing Mathews v. Kidder, Peabody & Co., Inc., 260 F.3d 239, 252 (3d Cir. 2001). Whether a plaintiff exercised reasonable diligence is both a subjective and objective question. Id. at 401 (citing Daimlerchrysler AG Sec. Litig., 269 F.Supp.2d 508, 513 (D.Del. 2003)). If a plaintiff failed to exercise reasonable diligence, the information they would have acquired through investigation is imputed to them. Id. (citing NAHC, 306 F.3d at 1326).

Locals 302 and 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust filed the original complaint in this case on February 22, 2010. Therefore, the Court must determine whether Plaintiff was on inquiry notice of its claims against Defendants one year prior to that date.

Publicly available news reports alone were sufficient to put Plaintiff on inquiry notice of its claims prior to February of 2009. For example, in August of 2007, the New York Times published an article reporting that "Countrywide was willing to underwrite loans that left little disposable income for borrowers' . . . living expenses." Gretchen Morgenson, Inside the Countrywide Lending Spree, N.Y.TIMES, Aug. 26, 2007. In April, 2008, the Wall Street Journal reported first quarter losses by Countrywide due to "serious problems" with its home loan underwriting, and noted that a federal probe turned up evidence that executives at the company "deliberately overlooked inflated income figures for many borrowers." Glenn R. Simpson and James R. Hagerty, Countrywide Loss Focuses Attention on Underwriting, WALL STREET JOURNAL, Apr. 30, 2008. According to the article, "Some of the problems are surfacing in a mortgage program called 'Fast and Easy,' in which borrowers were asked to provide little or no documentation of their finances. . . ." Id. In September

9

2008, the Chicago Tribune published an article condemning "[o]verly aggressive lenders" for playing a key role in the ongoing financial crisis, and pointing specifically to Countrywide as one of the "most obvious suspect[s]." David Greising, Enough Blame for All to Share, Chicago Tribune, Sept. 21, 2008.

Storm warnings were also present in a pair of reports published in 2008 by the Center for Responsible Lending ("CRL"). In February of 2008, the CRL published a report including allegations about "grave illegal" practices at Countrywide, including engaging in predatory lending and pushing dangerous and unsound products. Center for Responsible Lending, Unfair and Unsafe: How Countrywide's Irresponsible Practices Have Harmed Borrowers and Shareholders, Feb. 7, 2008. In June of 2008, the CRL published an equally scathing report on the practices of IndyMac, which included allegations of abusive lending, shoddy documentation of loans, and acceptance of loans despite exaggerated borrower finances. Center for Responsible Lending, IndyMac: What Went Wrong? How an "Alt-A" Leader Fueled its Growth with Unsound and Abusive Mortgage Lending, June 30, 2008.

Beyond these reports, Defendants have also called to the Court's attention a significant number of lawsuits filed prior to February of 2009 against Countrywide, IndyMac, and various securities corporations based on substantially similar allegations to the case before this Court. For example, an August 2006 class action suit against IndyMac Bancorp alleged "systematic and continued failure to provide independent and effective appraisals and evaluations," which caused damage to MBS holders. Complaint at ¶¶ 22, 23, Cedeno v. IndyMac Bancorp, Inc., et al., No 06-CV-6438 (JGK) (S.D.N.Y. filed Aug. 25, 2006), Ex. No.1 to Declaration of Lawrence J. Zweifach ("Zweifach Dec."), ECF No. 78-3. Even more telling is the fact that Lead Counsel for Plaintiff in

this action filed at least four of these lawsuits, all of them prior to February of 2009. See generally Defs.' Mot. Br. 28.

Plaintiff does not refute the existence of these storm warnings, nor claim that they were not available to the Pension Trust Fund for Operating Engineers, or any other member of the class. Rather, Plaintiff's primary contention is that these storm warnings were not specific enough to place Plaintiff on inquiry notice, and that Plaintiff could not have discovered the facts underlying its claims until after February 20, 2009, when the ratings agencies Moody's and S&P downgraded the tranche of MASTR Certificates owned by Plaintiff. Pl.'s Opp'n Br. 11. Plaintiff further argues that it was unable to discover that its claims existed without access to certain loan files, which would have permitted Plaintiff to determine specific borrower's names and addresses, and would have permitted Plaintiff to determine, based on LTV and DTI ratios, whether specific loans satisfied the represented loan criteria. SAC ¶¶ 187-189. Plaintiff states that on March 29, 2010, following the downgrades and in the course of the "usual monitoring of its investment portfolio," Plaintiff discovered significant losses in its portfolio, and retained a consultant to "reverse engineer" certain loan data. SAC ¶¶ 193-194. Plaintiff states that this investigation eventually resulted in the substantive allegations of the present litigation. SAC ¶ 195.

In arguing that the storm warnings did not place Plaintiff on inquiry notice, Plaintiff seeks to defeat Defendants' argument with distinctions. First, Plaintiff argues that Defendants' articles about subprime lending are irrelevant, as the MASTR Trust contained securitized "Alt-A loans," and not subprime loans. This argument is unconvincing, as the CRL report proffered by Defendant specifically refers to the collapse of IndyMac, noting that the company was an "Alt-A leader."

The second distinction Plaintiff attempts to draw is that "none of the lawsuits, news articles

11

or press releases cited by Defendants identifies MASTR, the MASTR Trust, the MASTR Certificates, the Individual Defendants, or any of the UBS entities that were involved in the Offering at issue here." Pl.'s Opp'n Br. 8. Plaintiff asserts that even "the most explicit" articles cited by Defendant could not have given rise to a probable securities act claim, "absent some clear evidence that those practices impacted the Certificates at issue in this case." Pl.'s Opp'n Br. 9. While this distinction is factually accurate, Plaintiff is simply asking the Court to expect too little of the hypothetical "reasonable investor of ordinary intelligence."

The Third Circuit rejected a similar argument in DeBenedictis v. Merrill Lynch & Co., Inc.. In that case, an investor brought a securities fraud class action against a securities brokerage firm, alleging harm caused by materially misleading statements in registration statements for mutual funds. DeBenedictis, 492 F.3d 209 (3d Cir. 2007). Specifically, the investor claimed that Merrill Lynch's Fund Registration Statements were misleading for failure to disclose that "Class B" shares "were never a rational choice of investment . . . and that Merrill brokers received larger commissions on sales of such shares." Id. at 210. In response, Merrill Lynch argued that the investor was barred by the applicable statute of limitations, since various news articles and press releases generically discussing the dangers of Class B shares had put the investor on inquiry notice of his claims more than two years before the filing of his lawsuit.[6] Id. at 214. The investor argued, as Plaintiff in this case has argued, that the news articles and press releases were not sufficient to serve as storm warnings because they were not "company-specific." Id. at 217. In rejecting this argument, the DeBenedicits court held that the news articles referred specifically to the practice of many mutual

---

[6] DeBenedictis involved both claims under 15 U.S.C. § 77m, governed by a one year statute of limitations, and 28 U.S.C. § 1658(b), governed by a two year statute of limitations. 492 F.3d at 215-16.

fund brokerages selling Class B shares for higher commissions, which made the storm warnings directly applicable to the representations or omissions made by Merrill Lynch. Id. at 218.

The same logic applies with equal force in this case. The gravamen of Plaintiff's claim is that the Originators wholly abandoned their underwriting standards. Plaintiff is presumed to have read the Offering Documents, which revealed that Countrywide and IndyMac originated over 91% of the loans placed in the MASTR Trust. The sheer volume of reports, articles, and lawsuits concerning the mortgage lending industry and MBS available prior to February of 2009 alone would be more than sufficient to put Plaintiff on inquiry notice of its claims. In the face of these overwhelming storm warnings, a reasonable investor of ordinary intelligence would not need to know the details of the specific loans that comprised their certificates in order to trigger an investigation. The fact that Lead Counsel in this case filed a number of the lawsuits at issue simply reinforces this Court's holding that Plaintiff was on inquiry notice of its claims prior to the filing of its lawsuit, and outside the statute of limitations.

Plaintiff does not attempt to argue that it acted diligently in light of these storm warnings. Rather, Plaintiff highlights its supposedly diligent efforts to uncover its claim following the Ratings Agencies' downgrades of the Certificates at issue. This is not the relevant inquiry, since Plaintiff was plainly on inquiry notice of its claims well before the Certificates were downgraded. Even it if were the relevant inquiry, however, Plaintiff's arguments would remain insufficient. Plaintiff's conclusory assertion in the Complaint that it "was and is diligent in its continued fulfillment of its fiduciary obligation to monitor its investments" is belied by its own assertion, one paragraph later, that it did not learn of significant losses to the value of its Certificates until March 29, 2010, over a year after the Certificates' ratings were downgraded. SAC ¶¶ 192-193. Plaintiff provides no

further elaboration of its efforts, other than to say that it did not have access to loan level data, and that it retained a consultant after being appointed Lead Plaintiff in this matter. This does nothing to demonstrate diligence. For these reasons, Plaintiff's claims are barred by the statute of limitations. Plaintiff's inability to demonstrate, in its Second Amended Complaint, that it complied with the statute of limitations indicates to this Court that permitting yet another amendment would be futile. Accordingly, Plaintiff will not be afforded another opportunity to comply with Section 13.

### IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is **granted** with prejudice. An appropriate Order accompanies this Opinion.

_____
Claire C. Cecchi, U.S.D.J.

Date: July 31, 2012